1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3    HONORABLE FERNANDO L. AENLLE-ROCHA, JUDGE PRESIDING

4   UNITED STATES OF AMERICA,          )
                                       )
5                                      )
                                       )
6                     Plaintiff,       )
                                       )
7                                      )
                                       )
8         Vs.                          )   No. CR21-00031-FLA
                                       )
9                                      )
                                       )
10  FRANK HAROLD ROSENTHAL,            )
                                       )
11                                     )
                                       )
12                    Defendant.       )
                                       )
13  _____   )

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17               SENTENCING

18          LOS ANGELES, CALIFORNIA

19        THURSDAY, NOVEMBER 9, 2023

20

21

22        MIRIAM V. BAIRD, CSR 11893
      OFFICIAL U.S. DISTRICT COURT REPORTER
23           350 WEST FIRST STREET
                FOURTH FLOOR
24      LOS ANGELES, CALIFORNIA 90012
              MVB11893@AOL.COM
25

UNITED STATES DISTRICT COURT

1                    **A P P E A R A N C E S**

2


3    **ON BEHALF OF THE PLAINTIFF,**        MARK AVEIS
     **UNITED STATES OF AMERICA:**          SARA E. HENDERSON
4                                           STEVEN ARKOW
                                            AUSA OFFICE OF US ATTORNEY
5                                           MAJOR FRAUDS SECTION
                                            312 NORTH SPRING STREET
6                                           SUITE 1100
                                            LOS ANGELES, CA 90012
7

8


9


     **ON BEHALF OF THE DEFENDANT,**        JAKE CRAMMER
10   **FRANK HAROLD ROSENTHAL:**            LISA LABARRE
                                            FEDERAL PUBLIC DEFENDER
11                                          321 EAST SECOND STREET
                                            LOS ANGELES, CA 90012
12

13

14

15

16

17

18

19

20

21

22

23

24

25

|     |     |
| --- | --- |
|     | 1 |
|     | 2 |

```
 1       LOS ANGELES, CALIFORNIA; THURSDAY, NOVEMBER 9, 2023; 0911

 2                           ---

 3            THE CLERK:  Calling case LACR-21-00031(A)-FLA,

 4    United States of America versus Frank Harold Rosenthal.

 5            Counsel, please state your appearances.

 6            MS. HENDERSON:  Good morning, Your Honor.  Sara

 7    Henderson appearing for the United States.  I'm joined by my

 8    co-counsels Mark Aveis and Steven Arkow.

 9            MR. CRAMMER:  Good morning, Your Honor.  Jake

10    Crammer here on behalf of Mr. Frank Rosenthal, who is present

11    and in custody.

12            I'm joined at counsel table by Ms. Lisa LaBarre,

13    another attorney from our office.

14            As a preliminary matter, I would like to request

15    that if the Court or the government would like to discuss

16    matters raised in the government's under-seal response to our

17    position paper, that the courtroom be sealed.

18            THE COURT:  All right.  We'll just take it one step

19    at a time.  I just want to make sure I know precisely which

20    document you're referring to.  There have been quite a few

21    that have been filed.

22            The government filed --

23            MS. HENDERSON:  It's docket number 160.

24            MR. CRAMMER:  That's correct, Your Honor.

25            THE COURT:  Okay.  I would imagine -- and I guess I
```

09:11AM    5
09:11AM   10
09:11AM   15
09:11AM   20
09:12AM   25

1    would encourage counsel, to the extent that you want to refer

2    to that, to the contents of that document, perhaps it can be

3    done in a way that's somewhat sanitized.

4              MS. HENDERSON:  Yes, Your Honor.

09:12AM  5              THE COURT:  Okay.  All right.

6              Good morning, everyone.  Welcome.

7              Mr. Rosenthal, I'm Judge Aenlle-Rocha.  I'm sure

8    you recall that I presided over your change-of-plea hearing

9    on June 30th of this year, along with a few other pretrial

09:12AM  10   conferences that we had before that date.

11             On that date you pleaded guilty to counts 1 and 2

12   of the first superseding indictment, charging you with wire

13   fraud in violation of Title 18 United States Code,

14   Section 1343.  We are here today for your sentencing.

09:13AM  15             I'd like to tell you a little bit how we will be

16   proceeding today during this hearing.  I mentioned some of

17   this to you during your change-of-plea hearing.  Under the

18   Sentencing Reform Act of 1984, the United States Sentencing

19   Commission issued guidelines for judges to consider when

09:13AM  20   sentencing individuals in criminal cases.

21             The Sentencing Guidelines today are advisory.  That

22   means that they are no longer binding on judges.  However,

23   even though they are no longer mandatory or binding, I am

24   still required by Supreme Court precedent to arrive at a

09:14AM  25   correct sentencing guideline range.  I'm required to consider

1    that sentencing guideline range along with a number of other

2    factors before I select and impose a final sentence.

3              As a result, during this hearing today I will be

4    making calculations under the Sentencing Guidelines, and I

09:14AM  5    will arrive at a final sentencing guideline range, and I will

6    consider that range before imposing sentence.

7              I will, to the extent that there are any

8    agreements -- and I know that there is no plea agreement in

9    your case.  But to the extent there's any agreement

09:14AM  10   whatsoever between the parties that impacts sentencing, I

11   will consider that.

12             If there are objections -- and I believe that there

13   are a number of objections -- to the calculations in the

14   presentence report, I will hear counsel out on those

09:15AM  15   objections, and I will rule on the objections in advance of

16   reaching a final sentencing guideline range.

17             During this hearing I will consider the statements

18   of the government lawyers.  I will consider statements by

19   your attorneys.  And if you wish to make a statement, you are

09:15AM  20   free to do so.  You are not under any obligation to make a

21   statement.

22             I will consider the recommendation of the probation

23   officer.  I may speak with the probation officer before I

24   impose sentence.  I will consider whether a sentence within

09:15AM  25   the sentencing guideline range is appropriate or whether I

should depart or vary from the sentencing guideline range.

I will consider a number of factors that we typically call the 3553(a) factors.  They are factors set forth at Title 18 United States Code, Section 3553(a), to decide whether I should impose a sentence within the guideline range or whether I should vary outside the guideline range.

The 3553(a) factors are the following.  They include the nature and circumstances of the offense and your personal history and characteristics, the need for the sentence that I impose to reflect the seriousness of the offense, to promote respect for the law and to provide a just and fair punishment for the offense, the need for the sentence to afford adequate deterrence to future criminal conduct by you and others, the need for the sentence to protect the public from further crimes by you, and the need for the sentence to provide you with any needed educational or vocational training, medical care, or other correctional treatment in the most effective manner that is currently available to us.

I am also to consider the types of sentences that are available and the need to avoid a sentencing disparity among defendants with similar criminal records who have been convicted of similar conduct.

Lastly, the need to provide restitution to the

victims of the offense.  Not all of the factors that I just
mentioned may apply, but that's the entirety of the factors
that are set forth at 3553(a).

        In preparing for today's hearing, I have read and
considered the various reports and recommendations of the
U.S. Probation Office, including the final revised report and
addendum and the sentencing memoranda that have been filed by
counsel, by the prosecutors and by your attorneys, including
a number of letters and statements that have been submitted
by victims, witnesses; by your, I believe, 13-year-old
daughter; and your October 2015 declaration that was filed in
connection with the state court civil action filed in King
County, Washington, in the action that was styled Copper Leaf
v. Rosenthal.

        Have both parties received and reviewed the final
presentence report?

        MS. HENDERSON:  Yes, Your Honor.

        MR. CRAMMER:  Yes, Your Honor.

        THE COURT:  All right.

        I'll start with you, Mr. Crammer.  And, defense
counsel, have you read and discussed the presentence report,
the addendum to it, and recommendation with your client?

        MR. CRAMMER:  I have.

        THE COURT:  Have you explained to your client the
standard conditions of probation and supervised release in

1    the Court's second amended General Order 20-04, which this

2    district has adopted?

3                MR. CRAMMER:  Yes, Your Honor.

4                THE COURT:  All right.  Have you read and -- let me

09:19AM    5    ask this of Mr. Rosenthal.

6                Mr. Rosenthal, have you read and discussed the

7    presentence report, the addendum to it, and recommendations

8    in that report with your attorneys?

9                THE DEFENDANT:  Yes, Your Honor.

09:19AM    10                THE COURT:  Okay.  And for purposes of today's

11    sentencing hearing, do you waive reading of the standard

12    conditions of probation and supervised release that are

13    contained in this district's second amended General Order

14    20-04?

09:19AM    15                THE DEFENDANT:  Yes, Your Honor.

16                THE COURT:  And, counsel, do you join and concur in

17    that waiver?

18                MR. CRAMMER:  Yes, Your Honor.

19                THE COURT:  All right.

09:20AM    20                I'm going to start with a summary of the probation

21    officer's sentencing guideline recommendations and

22    calculations before we get into any substantive discussion

23    concerning the merits of these calculations.

24                Counts 1 and 2 have been grouped for guideline

09:20AM    25    calculation purposes because the offense level is determined

largely on the basis of the total amount of harm or loss that has been caused to others.

The base offense level has been determined to be seven.  The offense level is seven because Mr. Rosenthal was convicted of an offense, in this case wire fraud, that is referenced to guideline Section 2B1.1, and the two offenses carry -- the two offenses of conviction carry a statutory maximum term of 20 years each.

An 18-level increase has been applied to the offense level because the offense resulted in a loss of more than $3,500,000 and less than $9,500,000 under guideline Section 2B1.1(b)(1)(J).

A two-level increase has been applied because the offense involved ten more victims or resulted in substantial financial hardship to one or more victims under guideline Section 2B1.1(b)(2)(A).  A two-level increase has been applied because the offense involved sophisticated means, and the defendant intentionally engaged in or caused conduct constituting sophisticated means under guideline Section 2B1.1(b)(10)(C).

A two-level increase has been applied because the defendant knew or should have known that the victim of the offense was vulnerable under guideline Section 3A1.1(b)(1).

A two-level increase has been applied because, one, Mr. Rosenthal willfully obstructed or impeded or attempted to

obstruct or impede the administration of justice with respect

to the investigation, prosecution, or sentencing of the

offense of conviction; and, two, the obstructive conduct

related to, A, Mr. Rosenthal's offense of conviction and any

09:23AM  relevant conduct, or, B, a closely related offense under

guideline Section 3C1.1.

A three-level decrease has been applied for early

acceptance of responsibility.  The probation officer has

concluded that Mr. Rosenthal accepted responsibility and

09:23AM  timely notified the government of his intention to enter a

guilty plea.  This is under guideline Section 3E1.1(a) and

3E1.1(b).

So this results in a total offense level of 30

under the guidelines, again based on probation officer's

09:23AM  guideline calculation.

Mr. Rosenthal has been assigned zero criminal

history points, resulting in a criminal history category

of I.  This results in a sentencing guideline range of 97 to

121 months.

09:23AM  With respect to the statutory maximum penalty, that

is 20 years per count.  As a result, the maximum term of

imprisonment that I could order is 40 years.

With respect to supervised release, the statutory

maximum is three years per count.  Under the guidelines the

09:24AM  guideline range for supervised release is one to three years

per count.

With respect to probation, by statute Mr. Rosenthal
is eligible for not less than one nor more than five years of
probation per count because each count is a Class C felony.
Under the guidelines, because the guideline range falls
within zone D of the sentencing table, Mr. Rosenthal is not
eligible for probation.

With respect to a fine, the maximum fine by statute
is $250,000 per count.  Under the Sentencing Guidelines, the
fine range is between $15,000 and $150,000.  There's also a
mandatory special assessment of $100 per count, or $200 total
in this case.

So I'm going to first take argument from counsel on
any objections to the presentence report, its findings, and
recommendations.  After hearing from counsel and their
respective clients or parties regarding the objections to the
presentence report, I will then rule on those objections.

After I have ruled on the objections and arrived at
a final sentencing guideline range, I will then hear from the
parties through counsel any victims and Mr. Rosenthal, if he
wishes to speak, as to the 3553(a) factors.

Okay.  So that's how we will proceed.

Based on the parties' respective sentencing
memoranda, it appears that the parties are in agreement only
as to the base offense level of seven and as to the

    1    three-level reduction for early acceptance of responsibility;

    2    is that correct?

    3              MS. HENDERSON:  Yes, Your Honor.

    4              MR. CRAMMER:  Yes, Your Honor.

09:26AM    5              THE COURT:  Okay.  All right.

    6              To be clear, I am consulting and taking into

    7    account the 2023 edition of the Sentencing Guidelines.  So

    8    let's start with arguments to the various calculations, to

    9    the probation officer's recommendations to me as to the

09:27AM   10    Sentencing Guidelines.

   11              Let's take them one at a time.  Each side addresses

   12    the arguments they wish to make until we're done.  Then I

   13    will rule on the objections.  Okay.

   14              So, Mr. Crammer, I believe you're making most if

09:27AM   15    not all of the objections, so if you don't mind, if you could

   16    go to the lectern.

   17              MR. CRAMMER:  Absolutely, Your Honor.

   18              THE COURT:  Thank you.  And we will move forward.

   19              So why don't we start first of all with the

09:27AM   20    18-level increase that the probation officer is recommending

   21    based on the amount of the loss.

   22              MR. CRAMMER:  Yes, Your Honor.  The government

   23    bases this enhancement, the 18-level enhancement, on an

   24    intended loss amount figure of approximately $3.9 million.

09:28AM   25    But after the Supreme Court's decision in Kisor, which

1    clarifies the amount of deference owed to guideline

2    commentary, or rather the amount of deference owed to an

3    agency's interpretation of its own regulations, intended loss

4    is relevant.

09:28AM    5        Mr. Rosenthal should instead receive a 14-level

6    enhancement for the actual loss amount of around

7    $1.17 million.  Now, in Kisor the Supreme Court held that

8    Courts should only defer to an agency's interpretation of its

9    own regulations if that regulation is genuinely ambiguous.

09:28AM    10        In both Kirilyuk and Castillo, the Ninth Circuit

11    applied Kisor to the guidelines commentary.  That is, the

12    Court need only defer to the sentencing commission's

13    commentary which does not undergo Congressional review if it

14    is interpreting a generally ambiguous provision from the

09:28AM    15    underlying guideline, which requires Congressional approval.

16        The only basis for considering intended loss is

17    application note 3A to the fraud guideline.  That note

18    purports to interpret loss, but it goes much further.

19    According to note 3, the Court should construe loss to mean

09:29AM    20    the greater of actual or intended loss.

21        And the Court should disregard that commentary for

22    two reasons.  First, loss does not mean intended loss.  If I

23    walked outside the courthouse and someone pulled a knife on

24    me and said give me a hundred dollars but I only gave them

09:29AM    25    $10 because that's all I had in my pocket, and someone asked:

What did you lose?  I would say $10, not the $100 that they meant to take.

It's a clear -- loss is a clear term that doesn't need the construction that the application notes have put on it.  They've basically seized on the term loss to institute their own regulatory scheme.

Second, note 3 says the Court should apply the greater of intended or actual loss.  There the commentary goes even further off the rails.  That's not a definition. It's a new regulatory scheme.  Even if loss meant both intended loss and actual loss -- and it doesn't -- but if it did, the guideline provision does not in any way suggest that the Court should apply the greater of those two figures.

In this the sentencing commission has tipped its hand.  The commission is not interpreting a generally ambiguous term.  It's setting up a new legislative scheme without Congressional approval.

As noted in my briefing, the Third Circuit has adopted this position in Banks, and another Court in the district recently discarded the intended loss commentary. The Court today should do the same.

THE COURT:  Thank you, Mr. Crammer.

Let me hear from the government as to what the increase should be for loss in this case.

MS. HENDERSON:  Yes, Your Honor.  The government

agrees with the 18-level increase for a loss range between

3.5 million but less than 9.5 million.  However, the intended

loss is not what that is based on.  It's the actual loss.

Even turning to defense's hypothetical that if

someone comes up and asks for a hundred dollars and all you

give is ten, then the loss is only ten.  Well, in this case

defendant asked for and took more than $3.5 million.  In

fact, he actually obtained $3,912,500 from victims of the

Alibaba scheme.

Moreover, the government argues that there is

relevant conduct for the lulling cannabis scheme where

defendant asked for and actually obtained $1.2 million in

addition to the $3.9 million.

So the government's argument is that there is an

actual loss of more than $5 million.  But either way, that

brings us to an 18-level increase.

THE COURT:  The probation officer did not take into

consideration losses attributable to conduct outside of the

Alibaba scheme, right?

MS. HENDERSON:  To reach the 18-level enhancement,

no.  But the cannabis scheme, the lulling cannabis scheme,

was considered relevant conduct for several other

enhancements.

THE COURT:  Okay.

MS. HENDERSON:  And I just wanted to point out --

1    THE COURT:  So the government's position in

2    essence -- and I'll let you finish -- is that the figure that

3    the probation officer has come up with as the loss amount is

4    actual loss and not intended loss?

09:32AM    5    MS. HENDERSON:  Correct.

6    THE COURT:  All right.  So the defense's argument

7    concerning the alleged vagueness of the term loss in the

8    guideline is not relevant in your view?

9    MS. HENDERSON:  Correct.  Kisor and Banks don't

09:32AM    10    apply because this is actual loss, not intended loss.

11    THE COURT:  Okay.  Go ahead.

12    MS. HENDERSON:  So reading between the lines, the

13    defendant calculates the loss amount to be the $1.1 million.

14    That appears to be based on the restitution calculation,

09:33AM    15    which is a different standard entirely.  And that figure also

16    excludes the $12,000 from victim SW, who was a victim of one

17    of the charged counts.  That was later corrected to be

18    included in the restitution amount.

19    And so for calculating loss, in any event, to get

09:33AM    20    to that figure below 3.5 million, there would have had to

21    have been some consideration for credits against loss,

22    whether it were repayments or victims obtaining collateral.

23    But those don't apply here.

24    Credits against loss for repayments only apply when

09:33AM    25    it's done for a pure motive, and they do not apply when the

17

1    repayments are made solely to either legitimize the scheme or

2    to cover up the scheme.  And that's what happened here.  Any

3    repayments either made by the intermediary individual one in

4    the indictment or defendant were simply to carry on the

09:34AM    5    scheme for years and years despite the short-term nature of

6    these loans.

7            Any pledged collateral made during these loans was

8    not collateral of defendant's.  It was collateral of the

9    intermediary's individual one.  So any of that should not be

09:34AM    10    considered to offset the loss amounts.

11            THE COURT:  So if a defendant is operating a Ponzi

12    scheme and as part of that scheme pays money back to

13    investors along the way to, in your words, lull them into

14    continuing to participate in the scheme, right, and give them

09:34AM    15    some sense of some false hope, those moneys that are returned

16    are not to be credited towards the loss figure?

17            MS. HENDERSON:  Yes, Your Honor.  And we have cited

18    cases to support that in our sentencing memo.  But just to

19    highlight them, that is United States versus Blitz, which is

09:35AM    20    a Ninth Circuit opinion regarding the repayments to lull

21    victims and legitimize the scheme.

22            Also United States versus Stoddard, also a Ninth

23    Circuit opinion, and United States versus Callaway, which is

24    an Eighth Circuit opinion.

09:35AM    25            And then as far as the collateral offsets, there is

1    support in United States versus Komar, which is a Second

2    Circuit opinion, and also United States versus McCormack,

3    which is a Ninth Circuit opinion.

4            THE COURT:  And is it your position that the

09:35AM    5    definition of actual loss applies in this case under the

6    guidelines?  I'm referring to application note 3.  It appears

7    the defense's argument is with the concept of, I guess, the

8    first sentence in 3A that says that loss is the greater of

9    actual loss or intended loss.  But there's a definition of

09:36AM    10    actual loss.  I haven't heard any objection to that.

11            Is it the government's view that the actual loss as

12    defined applies to the 3.5 million?

13            MS. HENDERSON:  Yes.

14            THE COURT:  In other words, is the 3.5 million the

09:36AM    15    reasonably foreseeable pecuniary harm that resulted from the

16    offense?

17            MS. HENDERSON:  Yes, but the loss amount is more

18    than the 3.5 million.  It's the 3.9 million for the Alibaba

19    scheme and the 1.2 million for the cannabis scheme.

09:36AM    20            THE COURT:  Okay.  Anything else on this point that

21    you'd like to say?

22            MS. HENDERSON:  Nothing further, Your Honor.

23            THE COURT:  All right.

24            Mr. Crammer, would you like to be heard any further

09:36AM    25    on this point?

```
 1              MR. CRAMMER:  I would briefly, Your Honor.

 2              THE COURT:  Briefly.

 3              MR. CRAMMER:  Your Honor, the case law that the

 4     government has referenced concerning repayments and whether

 5     they should be credited, that also stems from guideline

 6     commentary, guideline commentary that has gone even more off

 7     the rails than the actual and intended loss commentary.

 8     Again, the commentary is only supposed to be interpreting

 9     what the term loss means.

10              THE COURT:  Why isn't the loss the 3.9 million at a

11     minimum that the probation officer found?

12              MR. CRAMMER:  Because the victims got that money

13     back from Mr. Rosenthal and from his associate, Mr. Kunkle,

14     while --

15              THE COURT:  Even if supports the underlying

16     fraud --

17              MR. CRAMMER:  Your Honor --

18              THE COURT:  If it keeps it going?

19              MR. CRAMMER:  I can't imagine how a definition of

20     the word loss leads to the rule that if it supports the

21     undergoing fraud, it doesn't count.  If you get that money

22     back, that's not money you lost.

23              THE COURT:  Well, isn't there Ninth Circuit law

24     that says it?

25              MR. CRAMMER:  Construing those same guidelines that
```

1    have now been given a different level of deference than

2    they're owed under Kisor --

3              THE COURT:  Is it your position that application

4    note 3 in its entirety should not be applied?

09:38AM    5              MR. CRAMMER:  It is my position that to the extent

6    application note 3 goes beyond defining the term loss, then,

7    yes, it should not be applied.

8              THE COURT:  Okay.  So is it then your position --

9    because the actual guideline 2B1.1(b)(1), what it states is

09:38AM   10    if the loss exceeded $6,500, increase the offense level as

11    follows.  And then there's the loss table that follows.

12              So is it your position that the word loss there is

13    all any judge needs to calculate loss?

14              MR. CRAMMER:  Yes, Your Honor.  That is my

09:38AM   15    position.

16              THE COURT:  Understood.  Okay.  Anything else?

17              MR. CRAMMER:  No, Your Honor.

18              THE COURT:  Thank you.

19              Anything else from the government on this point?

09:38AM   20              MS. HENDERSON:  No, Your Honor.

21              THE COURT:  All right.  Let's turn to the two-level

22    increase that the probation officer has recommended because

23    the offense involved ten or more victims or resulted in

24    substantial financial hardship to one or more victims.

09:39AM   25              Mr. Crammer.

1          MR. CRAMMER:  Yes, Your Honor.  As you mentioned,

2     there's two alternative bases for this enhancement.  I'll

3     address each in turn.

4          When properly counted, this case actually involves

09:39AM  5     nine victims.  Under Pham the Ninth Circuit applied case law

6     regarding impermissible double counting to this enhancement.

7     In order for someone to count as an individual victim under

8     this enhancement, they must suffer a distinct harm from the

9     other victims involved.

09:39AM  10         The government counts 11 victims, but it engages in

11     impermissible double counting twice.  So the actual amount of

12     victims is nine.  They engage in impermissible double

13     counting as to Paul and Lois Kunkle and Robert and Kim McCaw.

14     They each suffered identical losses together.  This is clear

09:39AM  15     because they invested the money together; they lost it

16     together.

17         In fact, in the section of the PSR, in both

18     sections, listing the loss amounts and the restitution

19     amounts, they're listed as a single unit.  That's because

09:40AM  20     they did not suffer distinct harms.  So the guideline

21     enhancement can't apply on that basis.

22         Next, the government claims that this case caused a

23     substantial financial hardship for Mr. Paul Odlyzko.  This

24     argument fails for two reasons.  First, most of this argument

09:40AM  25     is premised on irrelevant conduct.  There were two ventures

that are referenced in the presentence report and in the
government's briefing.

One is the Alibaba scheme, which is the subject of
the indictment and is the scheme that Mr. Rosenthal has
pleaded guilty to.  The other is a dispensary venture.  That
dispensary venture was not charged.  It was not part of
Mr. Rosenthal's plea.

The government is now trying to sneak in additional
punishment through the back door by claiming that the second
venture is relevant conduct, but it's not.  First, the
dispensary venture happened years after the end of the
Alibaba scheme, so it clearly did not occur during the
commission of or in preparation for the offense of
conviction.

It also occurred after Mr. Rosenthal's Alibaba
scheme had already been detected.  He had already been sued
in court and responded to a lawsuit based on that scheme.  So
it was not the sort of scheme that he put in place to avoid
detection.

This is a different venture with a different
purpose involving an almost entirely different cast of
characters aside from Mr. Rosenthal and Mr. Odlyzko.  It has
nothing to do with this case, and Mr. Rosenthal should not be
punished on that basis.

Now, second, even if that case is relevant, it

didn't -- the harm that -- even -- and by case, I mean if the

dispensary venture is relevant, it didn't cause a harm that

rises to the legal definition of substantial financial

hardship.

Substantial financial hardship is a very high

barrier to meet.  The defense is not claiming that

Mr. Odlyzko did not suffer loss.  And we're not saying the

loss wasn't painful, but we are saying that it didn't meet

that legal definition.

If we look to the guidepost that the commentary

gives us in determining whether someone met substantial

financial hardship, Mr. Odlyzko did not become insolvent.  He

did not declare bankruptcy.  He did not delay his retirement,

pick up a second job, downgrade his home, obtain a reverse

mortgage on his home, or lose all of his savings.

He still had savings over at the end.  He was able

to remain in the same home and live off his retirement and a

pension, with occasional support from his family.  That is,

he lived the life that many retired individuals live in this

country.

The difficulties that Mr. Odlyzko cites are

certainly sad and may constitute some loss, but they don't

rise to the level of substantial financial hardship that must

-- that the government must meet to justify this enhancement.

THE COURT:  All right.  Thank you, Mr. Crammer.

1          Let me hear from the government on this specific

2     offense characteristic.

3          MS. HENDERSON:  Yes, Your Honor.  Regarding the

4     number of victims, there are more than ten victims.  There is

09:43AM    5     no double-counting issue because even according to

6     United States versus Pham, where the funds are the same exact

7     funds, as long as the victim suffered sufficiently distinct

8     harms, they can be counted separately towards the

9     number-of-victims enhancement.

09:43AM   10          Additionally, there are other cases in different

11     circuits -- United States versus Harris in the Seventh

12     Circuit, United States versus Ryan in the Second Circuit, and

13     United States versus Densmore in the 11th Circuit -- finding

14     that where spouses -- and in the words of defense now --

09:43AM   15     invest together and lose together do sufficiently have

16     distinct harms as far as counting the number of victims.

17          It's irrelevant whether the loss or restitution

18     don't count them as separate funds.  In fact, they cannot

19     because that would be impermissible double counting.  Those

09:44AM   20     are different standards.

21          THE COURT:  Is there any Ninth-Circuit law that

22     says that a married couple under this enhancement under the

23     guideline counts as a single victim versus two?

24          MS. HENDERSON:  I am not aware of a case directly

09:44AM   25     addressing that case of the spousal issue.

1          To give more light about United States versus Pham,

2     that was a bank fraud case where the same funds still

3     constituted towards counting more victims because the account

4     holders first suffered losses -- sorry, first suffered

09:45AM   5     because their accounts were depleted and they had to deal

6     with the stress and hardship of having to go and retrieve

7     those funds from their account and deal with that.

8          And then the banks themselves were also counted as

9     victims even though the same funds were at issue.

09:45AM   10          THE COURT:  Okay.

11          MS. HENDERSON:  And I'll turn to the substantial

12     financial hardship arguments now.

13          As a preliminary matter, the cannabis scheme is

14     relevant conduct.  While the defense focuses on the language

09:45AM   15     stating that it's to avoid detection, it also says to avoid

16     responsibility.  The government would argue that on both of

17     those foundations, the cannabis scheme is relevant conduct.

18          And second --

19          THE COURT:  And that is because?

09:45AM   20          MS. HENDERSON:  Because this is an offense that has

21     as an element scheme to it, and that is relevant conduct

22     under 1B1.3.  Any conduct that is taken after the offense

23     involving a scheme that is carried out for the purpose of

24     avoiding detection and responsibility constitutes relevant

09:46AM   25     conduct.

UNITED STATES DISTRICT COURT

1          THE COURT:  And how does that apply to the actual

2     facts in this case?

3          MS. HENDERSON:  So for the facts of this case,

4     Mr. Odlyzko had lost $400,000 for the Alibaba scheme.  And

09:46AM  5     when he invested in 2014, he continued to contact the

6     intermediary individual one asking about repayment.  He

7     continued to do so through e-mail communications with

8     individual one.

9          THE COURT:  You mean Mr. Kunkle?

09:46AM 10          MS. HENDERSON:  Mr. Kunkle, yes, Mr. David Kunkle.

11          And once he got tired of getting excuse after

12     excuse through the intermediary, Mr. Kunkle, he went directly

13     to the source in mid 2017 and e-mailed the defendant

14     directly.

09:47AM 15          That is when the defendant said:  Don't worry.  We

16     can get you repaid and wrap up the Alibaba scheme because I

17     have this new opportunity I'm working on 24/7.  And those

18     e-mail records have been disclosed in discovery to defense.

19          THE COURT:  And as a result of those

09:47AM 20     representations, did Mr. Rosenthal receive any additional

21     funds --

22          MS. HENDERSON:  Yes, Your Honor.

23          THE COURT:  -- from this victim?

24          MS. HENDERSON:  So in reliance on defendant's

09:47AM 25     representations about this cannabis business opportunity, the

27

1    victim, Mr. Odlyzko, sent over $1.2 million over several

2    years, 2017 through 2019, to open said business and

3    continually support its alleged operations.

4          But, in fact, state agency records and financial

09:48AM    5    records show that he didn't open such a business.  He didn't

6    apply for such a license.  And he, in fact, used those funds

7    on personal expenses and personal day trading.

8          THE COURT:  Okay.

9          MS. HENDERSON:  To the second point, defendant

09:48AM    10    argues that the cannabis scheme is not relevant conduct

11    because by 2015 another victim who Mr. Odlyzko didn't know at

12    the time sued the defendant.

13          The defendant doesn't cite any case law saying that

14    detection by one victim should be imputed to another victim.

09:48AM    15    But regardless, we wouldn't concede that the filing of a

16    lawsuit by Copper Leaf constituted detection.  Contrary to

17    the cited declaration which I believe is Exhibit A to the

18    defense sentencing memo, that declaration does nothing to

19    acknowledge detection of the fraud.

09:49AM    20          To summarize the points in that declaration --

21          THE COURT:  It actually denies it; doesn't it?

22          MS. HENDERSON:  Yes.

23          THE COURT:  Doesn't the declaration deny

24    culpability?

09:49AM    25          MS. HENDERSON:  Yes.  So the three points

UNITED STATES DISTRICT COURT

```
 1    essentially from that declaration is that he claimed he

 2    intended to buy Alibaba.  The second point, because the

 3    economics had changed, he used his business judgment not to

 4    invest in Alibaba.

 5         And the third point, that he did not use the funds

 6    for personal use, based on financial records which we've

 7    disclosed to defense, and our revenue agent has analyzed none

 8    of those points were true.  He did immediately use the funds

 9    for personal use in day trading.

10         THE COURT:  All right.  The loans were fully

11    collateralized; weren't they?

12         MS. HENDERSON:  Not all of them.

13         THE COURT:  Okay.

14         So some of the -- these are Copper Leaf funds?

15         MS. HENDERSON:  For the Copper Leaf funds, yes,

16    sorry.  I was thinking you were asking for additional

17    victims.  But for Rodger May's loans through his business,

18    Copper Leaf, they were collateralized by assets of David

19    Kunkle's, not the defendant's.

20         THE COURT:  So the lawsuit sought to...

21         MS. HENDERSON:  Recover funds.  At the time they

22    were not -- the victims were not seeking to take the funds of

23    David -- the assets that David Kunkle pledged.  They knew

24    that the defendant was the person who made off with the

25    funds, and so they wanted to hold him accountable and they
```

1    really didn't want to have to take the assets from

2    Mr. Kunkle.

3         And during that lawsuit the defendant took great

4    pains to refuse to comply with Court orders, failing to

09:50AM    5    appear for Court-ordered depositions to the point where the

6    Court ultimately issued a default judgment because of

7    defendant's refusal to comply with Court orders.

8         So in any event, that lawsuit doesn't constitute

9    detection of the offense.

09:51AM    10        I probably already hit this point, but just to

11   reiterate, when the defendant promoted the cannabis scheme in

12   2017, he directly linked the Alibaba scheme and the cannabis

13   scheme by saying that when Odlyzko asked about the $400,000,

14   that he could put everything behind them through this new

09:51AM    15   opportunity.

16        And then turning to the substantial financial

17   hardship, Mr. Odlyzko did suffer substantial financial

18   hardship.  Application note 4F is illustrative.  It's not

19   exhaustive.  The test for substantial financial hardship is

09:52AM    20   relative to the victim and where they stood at the time of

21   the offense and where they were left after the offense.

22        Defense argues today that after these offenses,

23   Mr. Odlyzko was left in a position that most Americans face

24   at that stage in their life, but that's not the stage he was

09:52AM    25   in when Mr. Rosenthal approached him with the two different

schemes.

He had made a nice retirement for himself and was
looking forward to that.  And by the time he had gone through
the Alibaba and cannabis schemes, he had lost most of his
savings to the point where he had to defer care for his wife,
and defendant knew that when the cannabis scheme was
underway.

Mr. Odlyzko conveyed to him several times that he
had liquidity issues.  And in order to get these urgently
needed funds to defendant, he was pulling money out of IRA
accounts and other savings accounts.

And as we noted in United States versus Minhas,
there is a wide range between leaving somebody with a minimal
loss and leaving somebody with a totally devastating loss.
That's where substantial comes in.

The following are just some examples of
Mr. Odlyzko's substantial financial hardships he suffered,
which are stated in his victim impact statement and memo of
interview, which are Exhibits 6 and 8 to the government's
sentencing memo.

As I stated, he lost most of his savings, which is
a factor in the application note.  He withdrew funds from his
wife's healthcare savings account to make ends meet and deter
his -- which ended up deferring his wife's urgently needed
medical care.

1          He was forced to sell shares of his former

2    employer, and he incurred significant tax liabilities for

3    these withdrawals from the various savings accounts.  He

4    delayed paying bills, including property taxes and utilities.

09:54AM  5    He maxxed out credit cards such that he had no available

6    credit, and his daughter had to help him negotiate with the

7    credit card companies a repayment plan.

8          He also delayed paying mortgage payments for

9    several months and had to beg the bank for forbearance so

09:54AM 10    they wouldn't foreclose on his home.  Without his family's

11    help, he would have filed for bankruptcy and sold his home.

12          And I just wanted to note that even cases relied on

13    by defense in their sentencing memo actually support applying

14    the substantial financial hardship enhancement here,

09:54AM 15    especially the Castaneda-Pozo case where a defendant's

16    actions made the victims insecure in life's basic needs.

17    Those victims were forced to borrow funds from friends and

18    family to make ends meet.  They took out high-interest loans

19    and fell behind on bills.  We would argue that those same

09:55AM 20    factors exist here.

21          THE COURT:  All right.  Thank you.

22          MS. HENDERSON:  That's all I have.

23          THE COURT:  Thank you.

24          Mr. Crammer, anything else?

09:55AM 25          MR. CRAMMER:  Just briefly, Your Honor.

1      THE COURT:  Go ahead.

2      MR. CRAMMER:  Your Honor, briefly to the point of

3  the double counting and the victims, I would say that the

4  government has claimed that the married couples suffered

09:55AM    5  distinct harms from one another, but they have not specified

6  what those distinct harms are.  Looking at the harms that are

7  listed, it does appear that the only harms listed they did

8  suffer together.

9      Moving on to whether the dispensary conduct is

09:56AM   10  relevant conduct.  It is true that Mr. Rosenthal had

11  approached Mr. Odlyzko as -- well, strike that.

12      Mr. Rosenthal was involved with Mr. Odlyzko in both

13  the Alibaba venture and the dispensary venture, so it is the

14  case that both ventures were discussed and brought up.  But

09:56AM   15  the question is whether he engaged in this dispensary venture

16  in order to evade responsibility or detection for the Alibaba

17  scheme, and that evidence is much more weak.

18      He seemed to be trying to get more money for

19  whatever purpose, whether to start a dispensary or otherwise,

09:56AM   20  from Mr. Odlyzko.  But it's unclear how that was evading

21  responsibility for the Alibaba scheme that was going on.

22  They're two separate ventures, and it should not be a basis

23  for punishment in this case.

24      I would also make the point that when he was sued

09:57AM   25  by Copper Leaf for the underlying Alibaba scheme, that was

1    detection.  They were saying that he had not made good on his

2    promises for the scheme that is underlying this offense.  The

3    fact that he raised defenses to that lawsuit and quibbled

4    with what the plaintiff's attorneys had said, that is his

09:57AM    5    right as a defendant in that lawsuit.

6            That's -- it's not a requirement for relevant

7    conduct that it happened before Mr. Rosenthal had accepted

8    responsibility or owned up to what he had done in the Alibaba

9    scheme.  It's whether it had been detected.  And by the time

09:57AM    10    that lawsuit was filed, a light had been shined on it and he

11    already saw it.

12            That's all I have on that enhancement, Your Honor.

13            THE COURT:  Okay.

14            Anything further from the government on this point?

09:57AM    15            MS. HENDERSON:  Yes, Your Honor, just briefly.

16            Just to turn to defense's argument regarding the

17    alleged double-counting issue, in cases where spouses' funds

18    have been deemed sufficiently distinct from each other and

19    therefore counted as separate victims is because spouses

09:58AM    20    suffer the loss or enjoy the gain from investments they make

21    together.

22            Both husband and wife count as victims because each

23    sustains a part of the financial loss.  And California is a

24    community-property state.

09:58AM    25            And then turning to the substantial financial

hardship points --

        THE COURT:  And you're saying most of your victims
were in California?

        MS. HENDERSON:  No, Your Honor.  Sorry.  No.  The
09:58AM  victims were located in either Washington, Minnesota, or
Illinois.  I believe that's where they were located.  Thank
you.

        And turning to the point for the substantial
financial hardship.  I've already iterated why the cannabis
09:59AM  scheme is relevant conduct to avoid detection and
responsibility.

        But also, additional proof that it was is that
Mr. Odlyzko asked for repayment for several years and
forbeared [sic] from bringing lawsuits or other actions
09:59AM  against defendant to recover in the hopes that this
additional business would recoup all of the funds and then
some.  The evidence of that is that he did withhold from
bringing a lawsuit until 2021.

        That's all.

09:59AM          THE COURT:  All right.

        Let's turn to the recommendation by the probation
officer that I apply a two-level increase because the offense
involves sophisticated means.

        Start with the defense.

09:59AM          MR. CRAMMER:  Yes, Your Honor.  As noted in my

briefing, probation and the government seek sophisticated

means enhancement based entirely on the use of e-mail, the

fact that Mr. Rosenthal created a fake e-mail address, that

he sent e-mails from that address and then forwarded those

e-mails to Mr. Kunkle and other folks involved in the scheme.

The use of e-mail does not constitute a

sophisticated means.  Now, in the dictionary definition cited

in my briefing, there are essentially two ways that people

use the term sophisticated.  One is for a level of technical

ability and the other usually connotes some sort of taste.

For example, Picasso was perhaps a sophisticated

painter because of his mastery of multiple complex

techniques, his ability to use brush strokes, perspective,

color, et cetera, and things like that to create a painting.

And someone could also be called sophisticated if

they appreciate Picasso's work.  They've studied art

history and can understand that the techniques he's

employing, various artistic phases, and such.

There's a common thread uniting both these

definitions.  If something is sophisticated, it means it

requires a certain ability or knowledge that not everyone

possesses that you have to work to earn and that sets you

aside.

E-mail is not sophisticated.  Anyone can use it.

Like many others, I've received e-mail forwards from

1    relatives who I did not think were technologically savvy

2    enough to start up a computer, but they were able to use

3    e-mail.  The PSR and the government applied different

4    adjectives to Mr. Rosenthal's use of e-mail in this case.

10:01AM    5    They call it deceptive and alluring, but this enhancement

6    targets sophisticated conduct.

7          E-mail does not require any special expertise or

8    knowledge like the types of expertise or knowledge referred

9    to in the commentary to the guidelines.  It is not the same

10:01AM    10    as opening a false business, using shell companies, or trying

11    to locate businesses in different jurisdictions to avoid

12    detection.  It is a simple commonplace technology that

13    literally anyone could use.

14          Furthermore, Mr. Rosenthal did not use e-mail in a

10:02AM    15    particularly sophisticated way here.  Looking to the e-mails

16    he sent, he didn't take steps such as fabricating a Goldman

17    Sachs signature block so that it looked like this came from

18    an employee, or creating a domain name that looks like it was

19    related to Goldman Sachs.

10:02AM    20          That would have maybe been a more sophisticated use

21    of e-mail.  I still don't think it would qualify for this

22    enhancement.  But that's not even what Mr. Rosenthal did.  He

23    used a basic technology in the most basic way imaginable.

24          THE COURT:  All right.  Mr. Crammer, I'm going to

10:02AM    25    ask you to take a deep breath and slow down.

| | |
|---|---|
| 1 | MR. CRAMMER:  Understood, Your Honor. |
| 2 | THE COURT:  Government counsel. |
| 3 | MS. HENDERSON:  Your Honor, as defense argues |
| 4 | today, mastery includes something like techniques used by |
| 10:03AM 5 | Picasso.  The government would argue that defendant has |
| 6 | mastered the art of impersonation and manipulation. |
| 7 | It's irrelevant that an action may be more |
| 8 | susceptible to detection, as defense highlights in the memo. |
| 9 | They say banking is somehow more sophisticated than e-mail |
| 10:03AM 10 | because of that risk.  And also it's irrelevant that a |
| 11 | technology used is commonplace. |
| 12 | As the law states in United States versus Jennings, |
| 13 | an enhancement applies to conduct that is less sophisticated |
| 14 | than those instances enumerated in the application notes.  A |
| 10:03AM 15 | scheme doesn't need to be brilliant.  It only needs to show a |
| 16 | greater level of planning or concealment. |
| 17 | What matters is that the defendant carefully |
| 18 | planned and took extra steps to make a scheme appear |
| 19 | legitimate and unique to attract investors and get them to |
| 10:03AM 20 | invest as soon as possible. |
| 21 | He didn't simply create and use an e-mail account. |
| 22 | He used the reputation and investment acumen of an imaginary |
| 23 | friend at Goldman Sachs to impress investors and because the |
| 24 | pre-IPO shares were not available to the general public such |
| 10:04AM 25 | that a Goldman Sachs connection was necessary to the scheme. |

1    Additionally, in the e-mails defendant used

2  industry jargon and complex investment concepts to impress

3  and bamboozle Mr. Kunkle as well as the victims into loaning

4  him money urgently.  He then used Martin Graham to play good

5  cop/bad cop.

6         As shown in the Martin Graham e-mails exhibited to

7  the government's sentencing memo, which is Exhibit 9, the

8  Martin e-mails were often reprimanding and told defendant and

9  Kunkle how they should be carrying out the scheme, demanding

10  they do it in particular ways and maintain secrecy.

11         Finally, through the e-mails he constructed a whole

12  identity for this Martin Graham as his friend by including

13  statements that expressed interest in, familiarity with, and

14  fondness for the defendant himself and his family.  He did so

15  at least 17 times.

16         If this were just a run-of-the-mill investor fraud

17  case, defendant didn't need to create imaginary friends in

18  high places who granted him access to exclusive investment

19  opportunities.  He could have just touted his own investment

20  acumen and relied on promised significant returns based on

21  his own efforts.

22         But as the defendant knew and intended and, as many

23  victims confirmed, the involvement of a reputable investment

24  firm such as Goldman Sachs made the victims feel at ease

25  giving their money to defendant and excited to participate in

the unique investment opportunity.  Without his imaginary

friends at Goldman Sachs, he was just a random guy asking for

money.

          THE COURT:  Anything else, Mr. Crammer?

          MR. CRAMMER:  Very briefly, Your Honor.

          THE COURT:  And slowly.

          MR. CRAMMER:  Understood.  Understood.

          Your Honor, I would just raise that deception is

inherent in a fraud crime.  We are not saying that

Mr. Rosenthal did not lie, and we're not saying that he did

not use e-mail deceptively.  We're just saying that it is

different.  We're saying that his use of e-mail simply was

not sophisticated, and that is all that matters for the

purpose of this enhancement.

          THE COURT:  Thank you.

          All right.  Let's turn to the probation officer's

recommendation that I apply a two-level increase because

Mr. Rosenthal knew or should have known that a victim of the

offense was vulnerable.

          MR. CRAMMER:  Yes, Your Honor.  We object to the

vulnerable victim enhancement for several reasons.  I will

start by raising the relevant conduct argument that we raised

earlier for the same reasons already stated.

          We would maintain that the dispensary conduct was

not relevant conduct to the indicted scheme, and so it should

1    not be taken into consideration with the vulnerable victim

2    enhancement.

3          Going down that line, vulnerable victim cannot

4    apply based on the Alibaba scheme alone.  Mr. Rosenthal is

10:07AM  5    not the one who recruited Mr. Odlyzko for this scheme.  The

6    way that the Alibaba scheme worked was that Mr. Kunkle went

7    out and solicited his friends and family members for

8    investments.

9          When Mr. Odlyzko first gave money over for the

10:07AM  10    Alibaba scheme, Mr. Rosenthal did not know him from Adam, and

11    he certainly did not know his age or any particular

12    characteristics about him that he could have ceased upon as a

13    vulnerability.  That's just not how it worked.

14          Furthermore, Mr. Odlyzko was not more vulnerable to

10:08AM  15    the Alibaba scheme than the other victims.  Four other

16    victims gave more than Mr. Odlyzko and four gave less.  He

17    was an average victim of the Alibaba scheme by those

18    measures.

19          Now, even if we look to the dispensary conduct as

10:08AM  20    relevant conduct, which we still maintain that the Court

21    should not, but if the Court were, it's inapplicable for a

22    few reasons.  First, even looking at all the money that

23    Mr. Odlyzko gave for both the Alibaba scheme and the

24    dispensary venture --

10:08AM  25          THE COURT:  And how much is that?

1    MR. CRAMMER:  Overall together it is around

2    1.6 million, 1.64 million.  That is only slightly more than

3    Mr. McDonald lost on the Alibaba scheme alone.  He lost about

4    1.4 million.  And that's two different schemes operating

10:09AM    5    together.  So the idea that he was more willing to give over

6    money than everyone else involved in this case does not seem

7    supportive.

8    Furthermore, Mr. Rosenthal did not know that

9    Mr. Odlyzko would keep giving him money at the time that he

10:09AM    10    spoke to him about the dispensary venture, and the vulnerable

11    victim enhancement only applies for characteristics that the

12    defendant knew or should have known at the time that -- at

13    the time that he recruited the victim.

14    THE COURT:  All right.  Thank you.

10:09AM    15    Government?

16    MS. HENDERSON:  I'll address the arguments in

17    reverse.

18    Defendant argues that Mr. Odlyzko wasn't a

19    particularly vulnerable victim when compared to other victims

10:09AM    20    because he gave an average amount of money.  That's beside

21    the point.

22    The best evidence that Mr. Odlyzko was particularly

23    vulnerable compared to other victims is that he was the only

24    victim recruited for a second scheme.  And defendant

10:10AM    25    approached him and succeeded multiple times over two years in

obtaining funds over and over again and obtaining more than

$1 million for that scheme.

Additionally, turning to the second point,

defendant says he didn't know that Odlyzko was particularly

vulnerable because initially it was David Kunkle who asked

him for the money in the Alibaba scheme.  While defendant may

not have known that Mr. Odlyzko was particularly vulnerable

in 2014, he certainly became aware of that fact and took

advantage of it beginning in 2017, carrying into 2018 and

into 2019.

Kunkle did not act as an intermediary at that

point.  The communications were directly between Mr. Odlyzko

and Mr. Rosenthal.  Defendant knew that Odlyzko was

especially desperate to recover the Alibaba loans that he

made and he repeatedly requested repayment, and all he was

met with were requests for more money by the defendant.

We would also argue that not only is it his special

vulnerability and susceptibility to the fraud by being

repeatedly solicited and giving more funds, but we would also

say that based on Mr. Odlyzko's age during the time of the

these offenses makes him also a vulnerable victim under the

enhancement.

As we noted in our filings under United States

versus Cancelliere, which --

THE COURT:  Sorry to interrupt, but his age at the

1    time of these acts was approximately what?

2              MS. HENDERSON:  I believe 78 or 80, about.  He's

3    here today, so he can clarify if he's given the opportunity

4    to speak.

10:12AM  5              THE COURT:  I think he's 80 right now, right?

6              MS. HENDERSON:  I believe so, yes.

7              THE COURT:  So this happened a few years ago, so he

8    would have been in his mid to late 70's.

9              MS. HENDERSON:  Yes.

10:12AM  10              THE COURT:  All right.  Go ahead.

11              MS. HENDERSON:  One of the cases we didn't cite in

12    the sentencing memo that we filed but nevertheless goes to

13    the age of victim, thereby making them a vulnerable victim,

14    is United States versus Lahmeyer.  That's a Ninth Circuit

10:12AM  15    case from 2000.  The citation is 230 F.3d 1368.  The age of

16    those victims was approximately 68 years old.

17              That's all that I have to say on that point.

18              THE COURT:  All right.

19              Anything else, Mr. Crammer, on this?

10:13AM  20              MR. CRAMMER:  Yes, Your Honor, a few brief points.

21              Your Honor, first, I would say the key question for

22    -- the government essentially has two theories here for how

23    Mr. Odlyzko was vulnerable.  One is that he was someone who

24    was more willing than most to give Mr. Rosenthal money, and

10:13AM  25    the other is age.  As to age, I've not yet heard the

government articulate the connection between age and this

offense.

THE COURT:  I think there's an argument also about

his financial condition, isn't there --

MR. CRAMMER:  I suppose so.

THE COURT:  -- Mr. Odlyzko telling Mr. Rosenthal

that he was having financial difficulties?

MR. CRAMMER:  Yes, Your Honor.  Yes.  I suppose I

grouped that with him being more prone to give Mr. Rosenthal

money.  In terms of age, there's not been a direct connection

made to Mr. Odlyzko's age and these schemes.

There also has not been evidence that Mr. Rosenthal

knew Mr. Odlyzko's age.  They didn't know each other, and

they corresponded primarily over e-mail.  I would also say

that as to Mr. Odlyzko being willing to give his funds over,

that is something that Mr. Rosenthal perhaps would have

learned over time, but it's not part of his recruitment of

him for this scheme.

When he requested money, that's not something that

he knew.  Mr. Odlyzko was just like the other victims of the

Alibaba scheme.  In fact, he wasn't one who had brought a

lawsuit against him.  So the thought that he was more

desperate or in need of money, there's evidence kind of

counteracting that as well.

Those are all the points I have in response to

```
 1    that.

 2              THE COURT:  All right.  Thank you.

 3              Anything more from the government on this point?

 4              MS. HENDERSON:  Yes, just briefly.

 5              Just as in telemarketing scams, essentially

 6    Mr. Odlyzko was a victim of reloading when the defendant

 7    became aware of his particular susceptibility to the types of

 8    schemes and his willingness to give money over and over

 9    again, particularly in light of his desperation to recover

10    the funds he had already given.

11              And additionally, as far as tying age to this

12    investment scheme, I would just point out that age makes one

13    vulnerable in and of itself because you're no longer in your

14    prime wage-earning years.  What you have is essentially what

15    you're stuck with the rest of your life.

16              And additionally, the ever-changing landscape of

17    investment vehicles and technology innovations can be foreign

18    to people of advanced age, making them more reliant on

19    representations of others without an ability to independently

20    verify representations by somebody who may be more savvy.

21              Defendant was aware that Mr. Odlyzko was hampered

22    in such a way and reliant on his representations because he

23    knew that Odlyzko couldn't come to verify the existence of a

24    cannabis scheme because he was taking care of his ailing wife

25    and couldn't leave her side.
```

1    THE COURT:  When you use the word reload, what do

2    you mean by that?  It was in your memorandum.  It sounds like

3    a term of art.

4    MS. HENDERSON:  It is.  So in I believe

10:16AM  5    telemarketing schemes is essentially where the term comes

6    from where that these victims will be approached over and

7    over again, sometimes 50, hundreds of times, and they

8    continually give money; and essentially they're put on a list

9    of, like, do solicit or do contact, because they're known to

10:17AM  10   repeatedly give funds to the fraudster.

11    THE COURT:  All right.

12    Let's turn to the request by the probation officer

13    that I apply a two-level increase for what I will call

14    obstruction interference with the administration of justice.

10:17AM  15   MR. CRAMMER:  Yes, Your Honor.  And just briefly

16    reiterating what we stated in our briefing, there is a Ninth

17    Circuit case, United States versus Raz in which the Ninth

18    Circuit panel was clear that an obstruction-of-justice

19    enhancement may not be applied on the basis of a defense

10:17AM  20   attorney's argument or their conduct.

21    Now, the basis for this obstruction-of-justice

22    enhancement is all --

23    THE COURT:  What were the facts in that case, the

24    one that you're citing to me?

10:17AM  25   MR. CRAMMER:  The one that I'm citing to you,

UNITED STATES DISTRICT COURT

1    essentially an attorney had obtained a declaration from a

2    co-conspirator, I believe, in the underlying case.  That

3    declaration was seen to be fraudulent later on down the line,

4    and the Court was considering applying the -- the Court had

10:18AM    5    applied the obstruction-of-justice enhancement for the

6    submission of that declaration.

7           There the Ninth Circuit held that you cannot hold a

8    defendant liable under the obstruction-of-justice enhancement

9    for conduct or statements made by a defense attorney.  Here

10:18AM    10   the obstruction-of-justice enhancement is based on statements

11   made by prospective counsel at a hearing to determine whether

12   they would be allowed onto the case and given a continuance.

13          They were not statements made by Mr. Rosenthal

14   himself.  And the statements concerning his uncle, the

10:18AM    15   properties in Florida, and a friend who may fund his legal

16   defense, those were all prospective counsel statements.

17          THE COURT:  Thank you.

18          MR. CRAMMER:  Yes, Your Honor.

19          THE COURT:  Government?

10:19AM    20          MS. HENDERSON:  Your Honor, just to clarify one

21   point, the obstructive conduct came from defendant's

22   declaration that he filed himself with the application to

23   continue the trial for, I believe, a fifth time based on the

24   false representation that he had a family member agree to

10:19AM    25   fund his new prospective retained counsel, specifically two

1    separate law firms, I believe, six attorneys in total, and

2    whatever litigation costs that they may have incurred.

3         And there's no evidence that any attorneys

4    persuaded him to make that declaration or filed it on his

10:19AM    5    behalf.  So that's the root of the obstruction enhancement.

6         But turning to the defendant's point that he can't

7    be held accountable for misrepresentations stemming from what

8    counsel does, they also correctly point out in their

9    sentencing memo that a defendant is accountable for their own

10:20AM    10   conduct and for conduct that the defendant aided or abetted,

11   counseled, commanded, induced, procured, or willfully caused.

12        That's what happened, and that's evidenced by the

13   fact that none of the prospective counsel, the government, or

14   retained counsel ever spoke to this alleged uncle.  All of

10:20AM    15   the representations then were coming from the defendant

16   himself.

17        Additionally, the defendant was present during all

18   of these proceedings, and he could have taken the opportunity

19   to correct the record.  He didn't.  Therefore, we would say

10:20AM    20   not only the declaration but also the representations by that

21   prospective counsel were all statements by the defendant that

22   were material to the issue under consideration, which was

23   continuing the trial for a fifth time.

24        THE COURT:  Sixth time, I believe.

10:21AM    25        MS. HENDERSON:  Sixth time.

1        THE COURT:  Anything else on this, Mr. Crammer?

2        MR. CRAMMER:  Just briefly, Your Honor.

3        First, Your Honor, I would disagree that this

4   enhancement is being sought primarily on the basis of that

10:21AM  5   declaration.  It -- in the PSR and the government's memo,

6   they rely heavily on the story told by prospective counsel

7   after that declaration was submitted.

8        If all the Court had was that declaration, it would

9   just be Mr. Rosenthal saying my family is going to help fund

10:21AM 10   my defense, and then he would not have gotten that, those

11   funds.  That is not obstruction of justice.  There's all

12   sorts of explanations for why that would happen.

13        In order to apply this enhancement, they're

14   inferring things from what defense counsel said.  Again,

10:21AM 15   there may be a guideline commentary provision, which was

16   cited in our briefing, that says he is accountable for

17   conduct that he caused or -- that may be true, but the Ninth

18   Circuit refused to hold the defendant liable for their

19   attorney's actions.

10:22AM 20        So it's not clear that that applies to someone's

21   attorney doing things purportedly on behalf of them in court.

22        And then finally, the truth is we don't know

23   whether Mr. Rosenthal told his prospective counsel that

24   story.  We don't know where that story came from.  It's

10:22AM 25   covered by privilege.  It's not something the government

1    actually knows.  I don't even know it.  That is -- that's

2    something that's sealed from us.  It can't be a basis for

3    this enhancement.

4            THE COURT:  All right.  Thank you.

10:22AM    5            MR. CRAMMER:  Yes, Your Honor.

6            THE COURT:  Since you're there, are there any other

7    objections to the presentence report?

8            MR. CRAMMER:  The other objection, Your Honor, is

9    we would apply a two-level decrease for the zero-point

10:22AM   10   offender, a provision that was added recently in 4C1.3.  And

11   it's clear it applies on its face given that Mr. Rosenthal

12   has zero criminal history points.

13           The only potential reason to not allow that

14   two-point decrease is if the Court finds that he caused

10:23AM   15   substantial financial hardship to another victim.  We

16   maintain for the reasons I stated earlier that that has not

17   happened here.  So I'll rest on those arguments.

18           I would say, to the extent if the Court does find

19   there's substantial financial hardship, assuming that the

10:23AM   20   Court would be finding that based on the conduct of

21   Mr. Odlyzko, then to apply both the substantial financial

22   hardship enhancement and to take away this two-level

23   reduction that Mr. Rosenthal is entitled to is arguably

24   impermissible double counting.

10:23AM   25           There's not case law construing this provision

1    because it was just -- it just went into effect about six

2    days ago.  So it's unclear how the court of appeals would

3    handle that, but it would be penalizing Mr. Rosenthal for the

4    same conduct in two different parts of the guidelines, which

10:23AM  5    is the hallmark of impermissible double counting.

6              THE COURT:  All right.  Thank you.

7              MR. CRAMMER:  Yeah.

8              THE COURT:  Government?

9              MS. HENDERSON:  Yes, Your Honor.  First, just to

10:24AM  10    clarify the obstruction enhancement, I was pointing out that

11    the root of the enhancement was the declaration being false.

12    We later learned of its falsity because there was no family

13    member produced in any manner that could substantiate the

14    claim.  If there was, it should have been simple to produce

10:24AM  15    the identity or some other fact of existence of such a

16    person.

17              And turning to the zero-point offender provision,

18    the government argues that the defendant doesn't meet the

19    criteria for this reduction because not only him causing the

10:24AM  20    substantial financial hardship to Mr. Odlyzko, but also

21    because he should receive the vulnerable victim adjustment,

22    which is another factor in the newly added provision.

23              THE COURT:  Mr. Crammer, do you wish to be heard

24    any further on this point?

10:26AM  25              MR. CRAMMER:  No, Your Honor.

1      THE COURT:  All right.  Any other objections to the

2   presence report?  We'll start with the defense.

3      MR. CRAMMER:  Not from the defense, no, Your Honor.

4      THE COURT:  Government?

10:27AM   5      MS. HENDERSON:  No objections, Your Honor -- just

6   to add that the cannabis scheme should be considered relevant

7   conduct.

8      THE COURT:  With respect to certain of these

9   adjustments, right?

10:27AM   10      MS. HENDERSON:  Yes, Your Honor.

11      THE COURT:  The amount of loss doesn't ultimately

12   affect the loss, right?

13      MS. HENDERSON:  Correct.  That would still be a

14   level 18.

10:27AM   15      THE COURT:  Okay.

16      All right.  As I said, I am consulting and taking

17   into account the 2023 edition of the Sentencing Guidelines.

18   As to those portions of the presence report to which the

19   parties do not object, I adopt the presence report as my

10:27AM   20   findings of fact and conclusions of law regarding the

21   advisory sentencing guidelines.

22      With respect to the parties' objections, I adopt

23   the following sentencing guideline factors and calculations:

24      I will start with loss.  I find that the loss is

10:28AM   25   more than $3,500,000 and less than $9,500,000, and that this

1    requires an 18-level increase in the offense level.

2              As set forth in the presentence report,

3    particularly at paragraph 36, Mr. Rosenthal solicited and

4    received $3,912,500 from 11 victims from 2013 to 2015.  The

10:28AM  5    victims loaned Mr. Rosenthal over $3.9 million for the

6    purpose of buying pre-IPO shares of Alibaba at a favorable

7    price, well below the public IPO price per share.

8              Mr. Rosenthal never bought those shares and had no

9    special access to anyone at Goldman Sachs who would make such

10:29AM  10   shares available to him.  Instead, he spent the funds on day

11   trading and personal expenses.

12             I agree with the government's assessment of the

13   loss.  I consider the loss to be actual loss as defined in

14   application note 3 of the Sentencing Guidelines, and it is my

10:29AM  15   view that there is evidence that supports the loss amount

16   based on victim statements, e-mail records, loan documents,

17   and records of bank accounts held by Mr. Rosenthal

18   personally; his business, Solutions 823; Mr. Kunkle, and

19   Mr. Rosenthal's housekeeper, along with the analysis made

10:30AM  20   available by the IRS revenue agent who tracked the victims'

21   transfers to Mr. Rosenthal and the withdrawals from those

22   accounts for Mr. Rosenthal's benefit.

23             Accordingly, I find that the actual loss in this

24   case is $3,912,500.

10:30AM  25             I will briefly address the defendant's argument

that application note 3 should not be considered or given

effect.  That argument is premised on the notion that the

term loss in Section 2B1.1(b)(1) is unambiguous and that the

Ninth Circuit's ruling in United States versus Castillo at 69

F.4th 648, a 2023 decision, that that ruling controls here.

The circumstances in Castillo were different.

There the Ninth Circuit refused to read into the career

offender guideline provision the crime of conspiracy to

commit a drug offense.

The guideline section at issue here -- excuse me,

at issue there in that case, specifically Section 4B1.2,

expressly defined the term controlled substance offense.  The

definition did not include the inchoate crime of conspiracy.

Application note 1 to that guideline section added to the

definition of controlled substance offense the crime of

conspiracy.

The Ninth Circuit refused to give effect to the

application note in that case because the term controlled

substance offense was unambiguous and it was explicitly

defined.  The guideline clearly did not include the crime of

conspiracy.

Here the term loss is not defined in the guideline.

All the guideline says is that, quote, if the loss exceeded

$6,500, increase the offense level as follows, and then the

loss table follows.

1          The Sentencing Commission devotes three to four

2     pages in the form of application note 3 to explain the term

3     loss.  The guideline, for example, does not state whether

4     loss consists only of actual loss or also includes intended

10:33AM    5     loss.  The guideline does not address the extent to which

6     gain is to be considered.  The guideline does not explain how

7     a Court is to calculate loss and to what extent it should

8     consider factors like fair market value and damage to

9     property, for example, in making the calculation.

10:33AM   10          The guideline does not address whether loss should

11    include interest, finance charges, late fees, penalties, and

12    agreed-upon rate of return, and costs incurred by victims or

13    the government to investigate and prosecute a crime involving

14    theft.

10:33AM   15          The guideline does not address whether loss should

16    include non-economic harm such as emotional distress and harm

17    to reputation.  The guideline does not address whether loss

18    should be reduced by moneys returned or recovered by victims

19    and whether the timing of such recovery should matter, or

10:34AM   20    whether in the case of a Ponzi scheme funds or property

21    transferred to one investor should be used to offset the loss

22    to another investor.

23          These are just a few examples of how the term loss

24    in the guideline is undefined and as a result, in my view,

10:34AM   25    genuinely ambiguous.

1          With respect to the Third Circuit's ruling in

2     United States v. Banks, which is cited in the papers, 55

3     F.4th 246 at page 257 from 2022, and the tentative ruling in

4     United States versus Lewis at 22 CR-225 by one of my

10:35AM  5     colleagues on this court.  Those decisions, of course, are,

6     one, not binding; and, two, ultimately based on a dictionary

7     definition of the term loss.

8          With respect to loss under the Sentencing

9     Guidelines, the term in my view is much too nuanced to lend

10:35AM 10    itself to a definition found in a dictionary, a reference

11    guide that was not created or intended to govern complex

12    sentencing calculations.

13         Again, this is borne out by the fact that the

14    Sentencing Commission has devoted three to four pages in the

10:35AM 15    form of an application note to interpreting and applying the

16    term loss and giving District Courts guidance in finding and

17    calculating loss.

18         Accordingly, I am giving effect to the relevant

19    portions of application note 3 and finding that the actual

10:36AM 20    loss in this case is just over $3.9 million.

21         Turning next to the number of victims and financial

22    hardship, I find that the offense involved ten or more

23    victims and that it resulted in substantial financial

24    hardship to one or more victims, requiring a two-level

10:36AM 25    increase in the offense level.

1          Here the offense involved 11 victims.

2     Mr. Rosenthal offers no binding authority for the proposition

3     that a married couple should count as a single victim instead

4     of two.  I'm electing to treat Paul and Lois Kunkle and

10:36AM  5     Robert and Kim McCaw as four persons, not two, and as victims

6     of Mr. Rosenthal's crime.  This finding alone justifies

7     imposition of this two-level increase.

8          But in addition, I also find that the offense

9     resulted in substantial financial hardship to one or more

10:37AM 10     victims.  Mr. Odlyzko lost most of his savings, maxxed out

11     his credit cards, had to delay necessary medical treatment

12     for his wife, suffered a loss of credit score, was forced to

13     borrow money from friends and family, had to negotiate a

14     payment schedule with creditors, was forced to rely on Social

10:37AM 15     Security, gave up working on inventions, stopped providing

16     financial support to family and friends who relied on him,

17     and faced increased tax liabilities as a result of early IRA

18     withdrawals because of Mr. Rosenthal's conduct.

19          This resulted in a substantial loss of savings and

10:37AM 20     investments and substantial harm to his ability to secure

21     credit.  This evidence is sufficient to establish the

22     substantial financial hardship to one or more victims.

23          Turning to the adjustment based on sophisticated

24     means, I find that the offense involved sophisticated means

10:38AM 25     and that Mr. Rosenthal intentionally engaged in or caused

conduct constituting sophisticated means, requiring a
two-level increase to the offense level.

        For Mr. Rosenthal's scheme to work, it required an
appearance of credibility.  Mr. Rosenthal fabricated a
retired Goldman Sachs executive or investment banker who he
named Martin Graham and who allegedly had a long-standing
personal relationship with Mr. Rosenthal and his family.

        Mr. Graham allegedly had access to Alibaba's
pre-IPO shares which he was willing to sell to Mr. Rosenthal.
Without Martin Graham, Mr. Rosenthal's scheme could not
succeed.  In addition to creating Mr. Graham, Mr. Rosenthal
manufactured an e-mail account and e-mails that appeared to
originate from Mr. Graham and to have been sent to
Mr. Rosenthal by Mr. Graham.

        I have reviewed those e-mails.  They create the
impression that Mr. Graham and Mr. Rosenthal shared a close
relationship, that Mr. Rosenthal had special access to
Goldman Sachs through Mr. Graham, and that Mr. Rosenthal
would need to act promptly at various times to secure funding
to acquire the advantageously priced Alibaba shares.  The
e-mails created a sense of urgency, a need to act promptly or
the special pricing window would close, whenever
Mr. Rosenthal wanted more money.

        Mr. Rosenthal repeatedly shared those e-mails with
Mr. Kunkle, who Mr. Rosenthal manipulated to raise the funds

<table>
<tr><td>1</td><td>he needed from his victims.  The e-mails, which are wholly</td></tr>
</table>

1    he needed from his victims.  The e-mails, which are wholly

2    fabricated, added the credibility and gravitas Mr. Rosenthal

3    needed to successfully commit his crime.  The fictional

4    Mr. Graham and his fictional e-mails were part of an

10:40AM    5    especially complex or intricate offense conduct essential to

6    the execution of the offense.

7            In addition, Mr. Rosenthal used bank and brokerage

8    accounts and negotiated and drafted loan agreements and

9    promissory notes in furtherance of a Ponzi scheme that used

10:41AM    10    investors' new moneys to pay prior investors to lull victims

11    into a false sense of hope and security, that everything was

12    as Mr. Rosenthal represented as investors were receiving a

13    return on their investment.

14            Although no longer novel, this scheme remains a

10:41AM    15    sophisticated means of carrying out a multi-million-dollar

16    fraud.

17            Turning to the adjustment based on vulnerable

18    victim, I find that Mr. Rosenthal knew or should have known

19    one or more of the victims of the offense were vulnerable,

10:41AM    20    requiring a two-level increase.  Mr. Odlyzko was in his 70's

21    during the commission of the crime, and Mr. Rosenthal

22    repeatedly victimized him, depriving him of most of his life

23    savings.

24            Mr. Odlyzko tells me that he told Mr. Rosenthal

10:42AM    25    about his liquidity problems and that if he didn't loan

1    Mr. Rosenthal more money, the chances of recovering on his

2    prior loans, meaning the Alibaba loans, would be greatly

3    diminished.  Mr. Rosenthal knew Mr. Odlyzko was elderly and

4    vulnerable, was in debt, and nonetheless went on to extract

10:42AM 5    another one million -- over one million dollars from him.

6          A district judge in the Northern District of

7    Illinois found that Mr. Rosenthal's conduct constituted

8    exploitation of an elderly person, and I do, too.

9          Turning to obstruction of justice, I find that

10:42AM 10   Mr. Rosenthal willfully obstructed or impeded or attempted to

11   obstruct or impede the administration of justice with respect

12   to the prosecution of the offense of conviction and that the

13   obstructive conduct related to Mr. Rosenthal's offense of

14   conviction, thus requiring a two-level increase in the

10:43AM 15   offense level.

16          I made findings from the bench on June 30th of 2023

17   after Mr. Rosenthal's change of plea that Mr. Rosenthal had

18   devised a scheme while on pretrial release to defraud the

19   Court, the government, and prospective counsel on the eve of

10:43AM 20   trial for the purpose of avoiding and delaying trial and

21   causing a sixth continuance of his trial.

22          Those findings led me to detain Mr. Rosenthal on

23   the grounds that he was both a flight risk and a danger to

24   others and the community.  I adopt those findings today for

10:44AM 25   purposes of applying the obstruction-of-justice enhancement

1   to the offense level.  There was no doubt the representations

2   concerning Mr. Rosenthal's fictional uncle who had supposedly

3   sold two properties and was willing to use the proceeds from

4   the sale to fund Mr. Rosenthal's litigation came from no one

10:44AM   5   but Mr. Rosenthal.

6       Application note 4 to guideline Section 3C1.1

7   contains a non-exhaustive list of examples of the types of

8   conduct to which this adjustment applies and includes at (f),

9   quote, providing materially false information to a judge.

10:44AM   10  That is precisely what Mr. Rosenthal did.

11      I am applying the three-level decrease for early

12  acceptance of responsibility.  With respect to the zero-point

13  offender adjustment that has been requested by the defendant,

14  I decline to grant a two-level downward adjustment.

10:45AM   15      New guideline Section 4C1.1(a), which took effect

16  on November 1st of this year, provides for a two-level

17  reduction if the defendant meets ten criteria, including that

18  he did not receive any criminal history points; that he did

19  not personally cause substantial financial hardship; and that

10:45AM   20  there was no adjustment for a vulnerable victim.

21      I have already found that there are facts in

22  evidence that support making adjustments based on vulnerable

23  victim and substantial financial hardship.  As a result, I

24  find that Mr. Rosenthal is not eligible for the zero-point

10:46AM   25  offender adjustment under the latest amendment to the

```
 1   guidelines.
 2           With that, I find that the total offense level is
 3   30.  With a criminal history category of I, a sentencing
 4   guideline range is 97 to 120 months.
 5           Now, as I said earlier, the Sentencing Guidelines
 6   are advisory, and 18 USC Section 3553(a) lists the factors
 7   that I am required to consider before I can impose an
 8   appropriate sentence.
 9           Mr. Rosenthal and the prosecutors have each filed
10   sentencing memorandums.  I've reviewed the sentencing
11   memorandums and the supporting documents.
12           Government, have the victims been notified?
13           MS. HENDERSON:  Yes, Your Honor, and we do have
14   several here today.
15           THE COURT:  All right.
16           My next question is:  Are there any victims who
17   would like to make a statement or present any information in
18   connection with the offense of conviction and the sentence?
19           MS. HENDERSON:  Yes, Your Honor.
20           THE COURT:  All right.  You may call your victims.
21           MS. HENDERSON:  We will start with Mr. Odlyzko, who
22   is here in the courtroom.
23           THE COURT:  All right.
24           Mr. Odlyzko, if you could step forward, sir, and
25   come up to the lectern.  You're welcome to adjust the
```

| | |
|---|---|
| 1 | microphone.  I want to make sure you're heard. |
| 2 | MR. ODLYZKO:  Okay.  Is the level good? |
| 3 | THE COURT:  That works, sir. |
| 4 | MR. ODLYZKO:  Okay. |
| 10:47AM 5 | THE COURT:  Go ahead. |
| 6 | MR. ODLYZKO:  All right. |
| 7 | Your Honor, I am very grateful for the opportunity |
| 8 | to present my account of dealing with Frankie and the |
| 9 | consequences of his actions.  I am a little bit nervous.  I |
| 10:47AM 10 | hope you'll forgive my -- |
| 11 | THE COURT:  All right.  Do me a favor and just lift |
| 12 | the microphone up a little bit. |
| 13 | MR. ODLYZKO:  Okay.  I'll try. |
| 14 | THE COURT:  There you go. |
| 10:48AM 15 | MR. ODLYZKO:  Thank you. |
| 16 | THE COURT:  I just want to make sure you can be |
| 17 | heard.  We're in a very large courtroom. |
| 18 | MR. ODLYZKO:  Yes. |
| 19 | THE COURT:  So I want to make sure you can be |
| 10:48AM 20 | heard, all right?  So make sure the microphone is nice and |
| 21 | close to where you are.  You can actually also adjust the |
| 22 | lectern.  It rises up and down. |
| 23 | MR. ODLYZKO:  Well, I don't know which is -- oh, |
| 24 | thank you.  Much better.  Much more convenient. |
| 10:48AM 25 | This morning I got a little bit better having |

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:48AM | 5 |

1   breakfast in, what was it called, Justice Cafe in the

2   restaurant, so --

3          THE COURT:  I hope that went okay.

4          MR. ODLYZKO:  Yes.  Thank you.

10:48AM    5          THE COURT:  Go ahead.

6          MR. ODLYZKO:  Well, my -- I was pulled into the

7   whole thing by request from somebody I considered my friend,

8   David Kunkle, whom I know, who I have known for several years

9   before it started.

10:49AM   10          He requested a short-term loan, three months maybe.

11   I trusted him a lot, and I had no -- he explained something

12   about the scheme:  Well, you know, it's his -- it was his

13   idea of, as he told me, to get rich.  Well, David, okay.

14   Please get rich.

10:49AM   15          And he, of course, offered some interest rate, et

16   cetera.  Only when I -- only when he provided instructions

17   for wiring money did I hear the name of Frank Harold

18   Rosenthal.

19          Well, I wired the money and waited until the IPO

10:50AM   20   because he said he will be able to pay me after IPO the whole

21   time.  Well, some April, nothing came.  Actually something

22   came -- a bunch of excuses.  There were problems of this or

23   that or some kind of dispute between Frankie and this what we

24   know now imaginary Goldman Sachs contact.

10:50AM   25          Much of the time David was the intermediary with

some contact with Frankie. Of course, I was getting a little

bit -- I was quite concerned about the delays, especially as

they dragged on for several years and I had no idea, no

indication from either of them that the whole scheme was

collapsed somehow. It was -- it was always assurance that

somehow it was still going on, that some things have to be

settled and I will get my money back.

Then in 2017 I get a call from Frankie who is

telling me about he has a wonderful scheme, a wonderful -- he

would not call it scheme. It was a wonderful idea, and he

was already in the process of implementing it. It had to do

with newly legalized cannabis, whatever, whatever it is

called.

He was just -- he knew how to obtain the license,

knew the process, and he was already in the process, already

doing it. But this time, interestingly enough, he was doing

everything under the name of Mirella Sandoval who was his

partner, he claimed.

Well, this will allow me to get the money back from

this new loan within a few months, and it will also let him

pay the overdue loan from Alibaba. Well, I was foolish

enough to continue believing it.

Now we can say the following. All the suppressing

any kind of indication that the Alibaba was, that it fell

through or whatever, it had the effect of lulling me into

1    inactivity so I would not try to go through a legal process

2    of recovering, of attempting at least to recover the money.

3         Well, okay.  I sent him the money, hoping --

4    somehow I still had this trust transferred from David Kunkle

10:53AM  5    to Frankie that I'm dealing with a resourceful, honest,

6    experienced businessman.  That's how David introduced him.

7         Well, come January of 2018, a new request appears.

8    Well, there's a new requirement apparently.  The licensing

9    commission makes up the rules, as it goes, and now he needs

10:54AM 10   -- he needs more money and so on.

11        This is when I actually quickly borrowed against my

12   wife's annuity, combination long-term care fund, money that I

13   would have to repay within 30 days.  He says, yeah, three

14   weeks and you'll get the money back, because it was something

10:54AM 15   temporary.  He, of course, said there were other people

16   involved with it and so on.

17        Well, 30 days passes, no money.  He could not do

18   it; however, he's making great progress.  From there I had --

19   I -- you see, I had this sort of temptation to actually

10:55AM 20   travel to check the facts.  However, this is the period when

21   I was very busy with work and also had to take care of my

22   wife, so somehow I didn't -- another step in -- another

23   foolish step.

24        Well, from then on, for the whole year I was

10:55AM 25   treated to an account of progress, progress, of course, that

UNITED STATES DISTRICT COURT

1    required some more funds, until it sort of culminated with he

2    was talking about efforts to obtain the license,

3    competitiveness of the process; then, of course, the whole

4    effort to facilitize [sic] the dispensary.

10:56AM    5           Interestingly enough, talking about Ponzi scheme,

6    now the money that he got in December -- I think it was

7    November, December -- well, one part of it became pretty

8    obvious soon afterwards.  What was supposed to be spent on

9    rent for the facility was actually going to his landlord to

10:56AM    10    cover rent for his residence.

11           So I did not -- of course, I had no idea that this

12    was happening.  I still trusted him.  Then, of course, what

13    follows on is an example of how sometimes difficult it is for

14    people to recognize they've been fooled.

10:57AM    15           So before Thanksgiving -- this was 2018 -- he

16    triumphantly announced that the dispensary is functioning.

17    And then he would send reports on the sales and all sorts

18    of -- there are lots of details, and it's painful even to

19    recall it.  And he already had buyers for the license and the

10:57AM    20    dispensary, except that a new snag appeared.

21           At the beginning of, well, January 2019, he just

22    was faced with tax liability for which he needed some more

23    money.  Of course, by that time I was -- my liquid assets

24    were gone.  All my shares in the company that I had, the

10:58AM    25    investments, all of this was -- somehow foolishly I admitted

that I had a numismatic collection, a collection that I

accumulated over several decades.  This was American, mostly

American gold and silver coinage of high grade and that I

intended as something that I would use with my grandchildren

as part of education about history, monetary evolution, and

so on.  Then, of course, this would be part of their

inheritance.

Well, I alerted him to the difficulties.  It's not

liquid.  It requires appraisals and so on and so on.  And,

oh, he had very good contacts.  He would be able to raise

money to borrow, to pay the tax liability.  Once the sale is

complete, he will get the collection back and he would send

it back to me.

Well, in February he told me that the sale fell

through by some difficulties.  He claimed that this was a

matter of -- I think he -- by that point he mentioned Rodger

May and Michael Zoretic as somehow actors in this particular

event.

He started this process when he was lining up new

potential buyers and so on and so on.  So he expected -- I

scrape all kinds of money, including somehow from -- well,

one bad thing that hit me in 2019 that I did not -- I lost my

regular salary because the company decided to redefine the

project and offshore it.

Now, of course, I made -- I started contacting the

|     |     |
| --- | --- |
|     | 1 |

```
         1    people that I knew, potential several startups or people who

         2    could take advantage of my experience, my expertise in the

         3    communications business.  Well, some of it was dragging on.

         4    Some of it would require relocation.  And then I had my wife,

11:01AM  5    and now I didn't have any money to provide for her.  The

         6    money was gone.  Even my non-liquid stuff was gone.

         7          I think you already heard the mention of the

         8    efforts to stop the outflow of money because of various

         9    bills, mortgage.  It's pathetic even to recall that.  So he

11:02AM 10    -- of course, at that time I was in no position to hire

        11    anybody to try to recover the funds.

        12          Of course, he claimed that he didn't have any, that

        13    he spent everything on the project and he was working on it

        14    24/7.  I'm exaggerating a little bit, but this was the effect

11:02AM 15    of it.

        16          Well, this -- he was in that -- I guess the

        17    relationship was in that mode for a while and he would never

        18    provide information about his whereabouts.  He kept -- he's

        19    sort of very reluctant to sharing information about the

11:03AM 20    contacts, about the lawyers.  He tried to deal with it with

        21    potential buyers.

        22          Everything was cloaked in either -- well, how

        23    should we say it, concern with -- he would come up -- he was

        24    very creative in coming up, sort of better repetitive but

11:03AM 25    actually creative in coming up with excuses.  I know only
```

that he moved to Texas, and then in 2020 he was going to
New York and had a new gig having to do with COVID-19, PPO
trading, whatever it is, always something on time, and now
this whole thing.  So it was -- for a period of time it was
building up this great thing that had collapsed.

Now he was having good income, but there were some
problems with -- with getting the funds to me, although I
begged him for a period of time.  I really -- it was a -- it
was a really desperate period for me, 2019 and 2020.

Then I experienced this new mode of Frankie
stretching things, promising things from week to week.  I
already have it.  I'll send it to you.  What about my
collection?  Well, previously it was apparently handed over
to some mysterious contact, associate of him named Sean.  It
was one named Sean Cohen.  He would never identify him.  He
would not give me information about him.

By other means, I had -- we discovered the very
likely telephone number.  I called him once.  After two
sentences he would hang up.  Since then from time to time I
would call it; immediately I would be transferred to voice
mail.

It turns out that my coin collection was used by
Frankie as collateral for some kind of loan.  I do not know
-- I would not trust anything coming from him.  But I know it
was gone, or it seems to be gone.

1          So now we can talk about the numbers.  There is a

2     definite arithmetic error perhaps because there are a number

3     of things that are not -- all of the funds were transferred

4     to Mirella Sandoval or were sent by various means to Cynthia

5     Rosenthal, Frankie's wife.

6          So basically the figure, if you count all the money

7     which I have a spreadsheet for now, it comes out to over $1.8

8     million.

9          Now, this does not include the collection which --

10    of course, what it's worth is a matter of appraisal.  But to

11    have appraisal, you would have to present this to the

12    qualified appraiser.  However, my -- the money I spent on it

13    was over $850,000 over several decades.

14         So now the only -- now I saw this new mode of

15    operation of these delays as, well, you know, there's a

16    statute of limitations.  The victim may get very sick,

17    incapacitated, and die.  And, of course, the loans -- I have

18    no idea what the new scheme was that Frankie concocted.

19         So from my experience, from my -- I cannot speak

20    totally for other people, although the Court documents

21    indicate that my experience is not totally unique, that

22    similar methods and similar approach was used before and

23    since.

24         So I -- from someone who I trusted, now I had to --

25    somehow my image of what, who I'm dealing with, is now -- I'm

talking to a very adept confidence man, amoral, sort of

cunningly persuasive, inventive in sort of manipulating

others' perceptions, and causing some clever and harmful

conduct.

11:09AM     So now I know it's been something that goes back

umpteen years.  Of course, the prosecution has a lot of

evidence that I don't, so I will not attempt to give a full

characterization.  I'm also sort of -- I am aware of various

resources available to white-collar criminals to become

11:10AM    normal people.

But definitely I look at it and say, you know, how

will he -- what will he do if he just -- if he were released?

Who is next?  Who is next?  The only -- what expertise, what

evidence do I have?  Well, developed skill in fraud.  And

11:10AM    according to what he was telling, because I have actually no

way to judge knowledge of the -- of some kind of cannabis

business.  I had no idea.

He told me he was very good, that he can sell

anything.  Well, he definitely sold me.  I was stupid enough

11:11AM    somehow to go along with it.

He showed disregard for the law.  When I told him

about our family, friends intending some legal action against

him, he said, well, you know, my lawyers will beat your

lawyers anytime.

11:11AM     So this -- so, you know, I view -- now I have to

1    say that I view him as a hardened crook who will look for any

2    opportunity to continue his actually predatory behavior, not

3    just parasite but a predator who will seize on an opportunity

4    to live off other people's resource energy.

11:12AM  5         There was a mention about harm that he did to our

6    family, health problems, my wife's family.  My wife's health

7    got worse until certain point she was hospitalized now twice,

8    something that could have been prevented by more time in

9    care.

11:13AM  10         My health suffered.  I could not afford any care

11    that sort of -- that requires spending money.  Medicare

12    covers only so much.  My relationships suffered.  The money

13    that I promised, the seed money for the project that I had

14    with my colleagues with whom we had a number of commercial

11:13AM  15    successes in development in various technologies, well, the

16    money evaporated.  It was stolen by Frankie.

17         The strain on my wife and my children, well, I

18    could not hide it.  I could not hide it, and it was sort of

19    sad to hear how much the defense counsel belittled the

11:14AM  20    effects on my family and me.  Some things may be -- part of

21    restitution in financial matters helps, but there are some

22    irreversible effects on life that we have to live with, and

23    there is no restitution for that.

24         Now, I hope, Your Honor, that the Court will find a

11:15AM  25    way to compel Frankie to reveal, for instance, what happened

UNITED STATES DISTRICT COURT

to the numismatic collection.  He never gave -- I don't

believe whatever he said, but it was in his hands in January

of 2019.  Then he apparently trusted it into the hands of

some mysterious Sean, and then he promised to return it to

11:15AM  me.  He was making -- he claimed he was making arrangements

to ship it to me.  It's -- it's a part of continued fiction

which he tried to peddle as fact.

So it's possible to -- of course, there are many

details that can be cited.  Of course, the prosecution

11:16AM  accumulated a lot, has a lot of evidence which -- additional

to what I experienced.  But this sort of -- it's a short

account of what happened in my case.

Thank you very much, Your Honor.

THE COURT:  Thank you, sir.

11:16AM  Would you mind telling me what is your date of

birth.

MR. ODLYZKO:  February 24, 1943.

THE COURT:  Thank you.

MR. ODLYZKO:  So basically my age was mentioned a

11:16AM  number of times.  I was 71 at the beginning.  I was 74 when

the cannabis -- I don't know how to call it -- cannabis tale

started.  Then, of course, we are now talking about

something --

THE COURT:  The economic loss that you suffered,

11:17AM  you quoted 1.8 million in total.

1          MR. ODLYZKO:  Yes.

2          THE COURT:  That includes the rare coin collection?

3          MR. ODLYZKO:  No.  No.  No.  This is -- this is the

4    sum total of wires, paying for his telephone bills, because,

11:17AM    5    of course, you have to -- I spent all my money on the

6    project.  Now I -- but I have to -- I need my telephone to

7    continue.  Money that was transferred, sent by PayPal or just

8    what, all just covering his bills.

9          There was one case when he just -- he just didn't

11:18AM    10   have money to pay for his rent.  There is another story about

11   his eviction, evictions which I do not know enough about to

12   speak knowledgeably.

13         So, you know, the spreadsheet with all of this was

14   sent to the prosecution team.  Similarly as all the text

11:18AM    15   messages, because a lot of this communication was by text

16   messages.  There is something over 20,000 of them.  Much of

17   it is junk, of course, you know, just trying -- but a lot of

18   it has to do with how are things going; where are you?  What

19   is -- what was the status of this or that.  And, of course,

11:19AM    20   countless telephone calls.

21         So there is a mountain of documentation on what

22   happened.  But the coin collection was not mentioned here as

23   part of the loss, a significant loss.

24         THE COURT:  And you value the coin collection at

11:19AM    25   approximately $800,000?  I recognize you acquired it over

1    many years.

2              MR. ODLYZKO:  And this is the sum total of the

3    money I spent on it.  The only way to say what it is -- see,

4    here's the point.  It has value.  Frankie's view was, well,

11:20AM  5    this is just something I can get and somehow sell or

6    whatever, although he never admitted to selling it.

7              It was always he just took a loan apparently to a

8    certain point and admitted that he got a loan to spend on

9    legal fees.  Well, maybe so.  Maybe not.  But this is -- this

11:20AM 10    is what it cost me.  How much it will be valued today, I

11    don't know.

12              The important part of it is also the emotional.  It

13    took effort.  It took -- it was very interesting, and I

14    really intended for this to be part of something I would

11:20AM 15    leave to my family.

16              THE COURT:  Thank you.

17              MR. ODLYZKO:  Thank you.

18              THE COURT:  All right.  We've been on the record

19    for just over two hours, so we need to give everyone here a

11:21AM 20    break, especially the court reporter.  The task of recording

21    everything that is said or stated in a courtroom is extremely

22    tiring.

23              I'm going to instruct counsel to provide spellings

24    of all names that are used during this hearing to the court

11:21AM 25    reporter to facilitate her transcription should that become

 1        necessary.  We'll go ahead and take about a 15-minute break.

 2                  All right.  Thank you.

 3                  THE CLERK:  All rise.

 4            (Recess taken from 11:21 a.m. until 11:44 a.m.)

11:44AM    5        THE COURT:  All counsel and parties are present.

 6        We'll continue with the sentencing hearing.

 7                  Are there any other victims who would like to

 8        speak?

 9                  Government?

11:44AM   10        MS. HENDERSON:  Yes, Your Honor.  Rodger May is on

11        the screen.

12                  I also was asked by Mr. Odlyzko if he may have two

13        additional minutes.

14                  THE COURT:  To finish?

11:44AM   15        MS. HENDERSON:  Yes.

16                  THE COURT:  Yes, he may.

17                  MS. HENDERSON:  Okay.  We'll let him finish and

18        then move to Mr. May.

19                  MR. ODLYZKO:  Your Honor, I do not want to waste

11:44AM   20        your time, but I did want to bring up again the Ponzi aspect

21        of it, because at a certain point Frankie started using me a

22        some kind of errand boy.  He wanted me to find this, find

23        that.

24                  He would ask me -- he would ask me if I knew -- at

11:45AM   25        a certain point he asked me if I knew anybody with a few

hundred million, whatever.  He had great schemes presumably.

For me it is evidence of looking for new victims presumably.

You know, this sort of implication if I help him get more

money, then it will help me -- you know, not explicit.  No.

He -- he's -- he is not sort of -- he knows how to modulate

things a little bit.

          The other one is -- I would like to refer again to

the federal case in Chicago, the federal court, the decision

in Chicago which basically lists all the -- has much of

points having to do with my case, quite detailed, and

emphasizes also, well, I have to say, my vulnerability

stemming maybe from stupidity, but it did happen.

          Then, of course, I would really appreciate if

somehow -- I don't know what -- I know what the legal term

is, replevin action, when it comes to my coin collection.  I

would like to recover it.  It's somewhere.  In whose hands it

is, I have no idea, but certainly Frankie has a better idea

what happened to it.

          I would sort of -- I would humbly request that this

recovery of it be also included in the sentencing decision.

          Thank you.

          THE COURT:  Thank you.

          MS. HENDERSON:  Now, Mr. May, if you would like to

speak with the Court.

          THE COURT:  All right.  Mr. May is appearing by

| | |
|---|---|
| | 1  video, by Zoom remotely.  I see him on the screen. |
| | 2  Mr. May, can you hear me? |
| | 3  MR. MAY:  I sure can, loud and clear, Your Honor. |
| | 4  THE COURT:  All right.  Very well, sir.  Go ahead. |
| 11:48AM | 5  You may speak. |
| | 6  MR. MAY:  The first request, is there any chance |
| | 7  possible that I'm able to look Mr. Rosenthal in the eye |
| | 8  during this, or is that just not working with Zoom? |
| | 9  THE COURT:  There are -- I don't know the answer to |
| 11:48AM | 10  that.  There are various camera angles that are available for |
| | 11  viewing.  I don't know if there's a camera angle that -- |
| | 12  there may be one that captures this.  It's a fairly large |
| | 13  courtroom. |
| | 14  MR. MAY:  I just want to see if there's any sort of |
| 11:48AM | 15  remorse in his eyes, you know. |
| | 16  THE COURT:  Go ahead.  I'm here to hear from you. |
| | 17  MR. MAY:  Okay. |
| | 18  THE COURT:  Make sure you are close to your |
| | 19  microphone.  I am sensing that the sound, the strength of |
| 11:49AM | 20  your voice increases and diminishes.  If you roll back, I |
| | 21  lose it.  So please stay close to your microphone. |
| | 22  MR. MAY:  How is that?  I will try to speak loud |
| | 23  and direct. |
| | 24  I had, you know, a 5- to 7-minute speech written |
| 11:49AM | 25  and drawn up.  In light of what I've heard, I think I'm going |

UNITED STATES DISTRICT COURT

1    with the approach to wing it.  So it might not come out as

2    flowing, but I think it much more addresses what I've learned

3    today.  This is my first time making a victim's impact

4    statement.

11:49AM    5         A little quick background about myself is --

6         THE COURT:  Mr. May, I'm just going to interrupt

7    you because the court reporter is indicating to me that she

8    cannot hear you.  So it is absolutely essential that she hear

9    you, otherwise your statements cannot be recorded.

11:50AM    10         MR. MAY:  Okay.  Is that better?  I will talk

11    straight into the speaker.

12         THE COURT:  All right.  Let's see if we can -- can

13    we make any adjustments to the volume of the sound in the

14    courtroom?

11:50AM    15         THE CLERK:  Your Honor, we're on max.

16         THE COURT:  Okay.  Well, I guess we've done all we

17    can on our end.

18         MS. HENDERSON:  May I suggest, Mr. May, if you have

19    a case on -- I think you're using an iPad.  Maybe if you

11:50AM    20    remove that.  It might be covering the microphone.

21         MR. MAY:  Okay.  It's off.  So if I just talk right

22    into it, does this help much better?

23         THE COURT:  And if you could maybe move the angle

24    so we can both see you and hear you.

11:50AM    25         MR. MAY:  Okay.  Are we able to hear it clearly

1    now?  I can hear you guys loud and clear.

2            THE COURT:  It's not as loud as I would like, but

3    let's do what we can.  If the court reporter has a problem,

4    she will let me know.

11:51AM  5            MR. MAY:  Thank you, Your Honor.  Thank you, court

6    reporter.  I will do everything I can to enunciate clearly

7    and talk loudly.

8            A little quick background on myself is I have spent

9    over 30 years in the lending side of my life, over

11:51AM  10   $100 million a year, which puts me well over a billion

11   dollars in lending.

12           I'm only mentioning this so it gives a little bit

13   of credibility that I've never in my life seen anything like

14   I've seen in Frank Rosenthal.  He is a pro, and I don't mean

11:51AM  15   a pro in a good way.  He is callous.  He is brazen.  He is

16   highly sophisticated.

17           Sadly I would give him credibility of being a goat,

18   right up there with greatest of all time.  Bernie Madoff, he

19   paid nothing compared to what I've seen Mr. Rosenthal do.

11:52AM  20   Mr. Rosenthal starts this out as a lie, a manipulated plan,

21   and never wavered from his lie and manipulated plan.

22           I blame Frankie Rosenthal for David Kunkle's death.

23   He was a proud, healthy man at the beginning of my

24   acquaintance with him and Rosenthal.  By the end he was a

11:52AM  25   broken, broke man.  Frankie wiped out this man's life, his

1    life savings, his heart and soul.

2            Mr. David Kunkle is not here to speak today, but I

3    am here to tell you that you are solely responsible for how

4    his last five years of his life went, which were absolutely

11:53AM   5    horrific.  You broke the man.

6            He was a good man.  He had savings.  He wanted this

7    money not for his own personal greed.  He wanted this money

8    to give away to children, to help kids, to leave a legacy.

9    You stole that legacy, Frankie.  You stole it.

11:53AM  10            I hear about moneys that have gone to rent.  I was

11    told that you were spending $30,000 a month on rent from

12    stolen money from people you destroyed who couldn't even

13    afford medical care.  Callous, brazen, calculated.  You are

14    basking in a $30,000 a month with other people's money.  I

11:54AM  15    can't even fathom that.

16            Mr. Zoretic and myself -- you'll be hearing from

17    Mr. Zoretic next -- spent hundreds of thousands of dollars in

18    energy, in time, and money hunting you down.  If it wasn't

19    for us, you likely would be still victimizing innocent

11:54AM  20    people.

21            I am so happy this day is here.  I hope -- I hope

22    and pray that you never see the light of day and that this

23    courtroom has the ability to make darn sure you never, ever

24    do this to another human being again in your life.

11:55AM  25            You have far more than nine victims.  You have

UNITED STATES DISTRICT COURT

1    those children, the grandchildren, the legacies, all that

2    were stolen from people with, again, no remorse.  I have seen

3    nothing from you that shows any remorse.  You've lied until

4    the very last minute, Mr. Frank Rosenthal.  Your wife Cynthia

11:55AM    5    was side by side to you all the way through this.  Is she

6    living off that coin collection?

7          I find it hard to fathom that you have nothing

8    left, that your victims aren't going to see any restitution

9    while you can sit there and plead for leniency.

11:56AM    10    Unfathomable.

11          Let me just check my notes to see if I missed any

12    points.

13          I believe that's it, Your Honor.  Again, thank you

14    to the legal justice system for finally getting it here.

11:56AM    15    Thank you to the FBI.  Thank you for the prosecution team,

16    because without a relentless battle we -- as you noted, we

17    spent years of having him show up -- or not show up, I should

18    say -- to Court-Ordered appearances, lie after lie about

19    heart attack or this or that to avoid things.

11:56AM    20          You are a chronic liar, Mr. Frank Rosenthal, with

21    no remorse.  Callous and brazen.  You have caused many people

22    financial hardship.  The biggest one I do believe is

23    Mr. David Kunkle, who died broke and broken because of the

24    financial hardship you caused.

11:57AM    25          I wish I could be looking you in the eye, but I'm

1    not.  Hopefully somebody can tell me at the end of this

2    whether there was any tear, any remorse in your face.

3         That's all I have, Your Honor.  Thank you for

4    letting me speak.

11:57AM  5         THE COURT:  All right.  Thank you, Mr. May.

6         Government, is there any other victim who would

7    like to speak during this hearing?

8         MS. HENDERSON:  Yes, Your Honor.  Michael Zoretic,

9    who is -- or who was acting during the Alibaba scheme as

11:58AM 10   Mr. Rodger May's attorney.

11        THE COURT:  All right.  Mr. Zoretic is also

12   appearing by video remotely, and I can see him on the screen.

13        Mr. Zoretic, if you could just begin.  I want to

14   make sure that you also can be heard in the courtroom.

11:58AM 15        MR. ZORETIC:  Good morning, Your Honor.  My name is

16   Michael Zoretic.  I hope that you can hear me clearly.

17        THE COURT:  So far so good.

18        MR. ZORETIC:  As you noted, Your Honor, I acted as

19   counsel to Rodger May and his company, Copper Leaf.  I

11:58AM 20   actually submitted a detailed victim impact statement a few

21   months ago, and I can tell from the prior proceedings that

22   you've done an outstanding job of reviewing all the

23   materials.  So I'm not going to go through my entire timeline

24   that I included in that victim impact statement.  It dates

11:59AM 25   back to June of 2014.  So I'm just going to keep my comments

1   short.

2          Like my client, Rodger May, I am very, very glad to

3   be able to see this day come.  It's been almost nine years in

4   the making for Mr. May and I to seek justice for the many,

11:59AM    5   many victims of Frank Rosenthal, not the least of which would

6   be David Kunkle.

7          Mr. May came to know David Kunkle after the loan

8   process started in June of 2014, but as I stated in my

9   personal impact statement, I knew David Kunkle from at least

11:59AM   10   14 or 15 years prior to that.

11          And what is most shocking to me as a professional,

12   as a lawyer, as an intimate witness to what Frank Rosenthal

13   did over the last nine years -- and it's even still ongoing,

14   it sounds like, based on the Court's earlier ruling -- what

12:00PM   15   absolutely astounded me is his ability to gain the trust of

16   people and keep the trust of people even when his scheme is

17   unravelling and falling apart.

18          I have been a lawyer for 30-plus years.  I'm a

19   commercial litigator, real estate, construction law.  I'm not

12:00PM   20   a criminal lawyer, and I'm not going to comment on the

21   criminal processes and even the Sentencing Guidelines very

22   much here.  It's outside my bailiwick, Your Honor.

23          I've dealt with a lot of people who have tried to

24   rip other people off and, like Rodger May said a moment ago,

12:01PM   25   I have never seen such a skilled, ruthless, absolutely

unrepentant manipulator of other people.  I was trying --

I've been trying to come up with a name for what Frank

Rosenthal is when you use people.  There's con man, where you

gain the confidence of somebody.  That's one level.  But when

12:01PM   you use another person whose confidence you've taken and you

use that person as a shill to go get money from other people

who have confidence in that person, I don't know what the

word is.  It's not a ventriloquist with his dummy or Geppetto

and Pinocchio.  I don't know what it is.  It is evil what he

12:01PM   did.

So starting in 2015, when fortunately Mr. May had

required as part of this very trusted person, David Kunkle,

and his allegedly very close friend, Frank Rosenthal, when

they came for the loan, Mr. May wanted to be collateralized.

12:02PM   So, as the Court knows, David Kunkle collateralized the loan.

Frank Rosenthal used David Kunkle.  He was fine

with David Kunkle pledging his properties, including a duck

pond property that was very, very important to David Kunkle.

But Frankie was okay with that.

12:02PM   So from that time on, I have seen Frank Rosenthal

create a web of lies, continue to try to buy time through

lies, knowing full well that me, a license attorney who I

think has shown some determination in exposing the truth,

even after I started the litigation in July of 2015 to go and

12:03PM   find the truth, number one, from Frank Rosenthal, all he did

was double down by, first of all, hiring two of the largest

law firms in the city of Seattle to defend the lawsuit, who

ended up withdrawing.  And then he got a third lawyer after

that.

Anybody in the court knows that we were able to get

a judgment later on, but the evidence that I've heard and I

know of from my own experience is that even though we were on

to him, he was still ripping other people off.  He was still

manipulating David Kunkle.

I will never understand how Frank Rosenthal was

able to manipulate my friend, David Kunkle, for so long.

It's heartbreaking, and I will never understand it.  But on

top of David Kunkle, also I'm hearing now, and as I said at

the time, that there were other people that he just continued

to go out and essentially steal money from.

I don't -- there are levels of crime.  There's the

stealing bread because you're starving crime.  There's the

stealing money from a bank just because you want the money.

But there's got to be a higher level of crime when you use

and manipulate people and ruin their lives so that you can

get money through them.  And then even when your lies and

deceit are being exposed, you brazenly go out and find new

victims.

Mr. Rosenthal -- and I can't see him either,

Your Honor, and unfortunately Mr. May and I were not able to

arrange to come down to Los Angeles today -- we gave him

opportunities all the way back in the beginning of the

process, which for us would have been in 2015, in the second

loan that was made in approximately January of 2015, to come

clean, to tell us what was really going on, because the

Alibaba story wasn't making sense.

     What he did was he continued to hold onto that

story until much later in the process, and he never, ever

came clean.  David Kunkle was the one who took the brunt of

all of that pain because of Frankie Rosenthal refusing to

come clean.

     I sit here today as an officer of the court.  I'm

an attorney, and I will tell the Court that I believe,

Your Honor, under the four major components of your

sentencing guideline recommendations, that this is a -- this

is a case where the sentencing range needs to be met all the

way to the top or, if not, exceeded.

     This man, Frankie Rosenthal, is a danger to

society.  He hasn't changed.  He knows no other way.  And

rarely will the Court find such a gifted graft artist, a con

artist of this proportion.  Mr. May called him the goat, the

greatest of all time.  Of course, that is an absolute

terrible moniker to hang on somebody, but it's true here, the

seriousness of this offense.

     He would have taken Rodger May for another two or

1      three million dollars if we hadn't started, you know, amping

2      up the diligence and the questions that were never answered.

3      The seriousness of this offense is huge.  I know there are

4      other victims that aren't even part of this process that have

12:06PM    5      also fallen victim to this man.

6              The public needs justice here.  Deterrence?  I

7      don't know Frank Rosenthal can ever be rehabilitated as a

8      good person who doesn't just go out and steal from people,

9      but I know this:  A long prison sentence will deter him from

12:07PM   10      going out and finding the next Paul Odlyzko or David Kunkle.

11              So, Your Honor, I know this is an important day

12      because we've waited eight years for Frank Rosenthal to sit

13      in a court of justice and have his rightful punishment doled

14      out to him.

12:07PM   15              I know he's probably going to talk about how he has

16      got a family and all of that.  He's had a family this entire

17      time while he was ripping off other families.  The public

18      needs to be protected from Frank Rosenthal.  And 40 years --

19      I don't know exactly how old Mr. Rosenthal is.  I think he's

12:07PM   20      in his middle 40's.

21              I just -- Your Honor, this is a drastic -- this is

22      drastic case unlike anything I've ever seen, and I hope it's

23      never repeated.  And you have a big part to play in that.

24              Thank you for your diligence and all your review,

12:08PM   25      and thank you for your wise judgment.

1          THE COURT:  All right.  Thank you, Mr. Zoretic.

2          Any other victims?

3          MS. HENDERSON:  No, Your Honor.

4          THE COURT:  All right.

12:08PM  5          Would the government like to be heard before I

6    impose sentence?  Again, reminding everyone the Sentencing

7    Guidelines are advisory, and 18 USC Section 3553(a) lists the

8    factors I am required to consider before I impose a fair and

9    just sentence.

12:08PM  10         MS. HENDERSON:  Yes, Your Honor.

11         THE COURT:  You may be heard.

12         MS. HENDERSON:  I'd like to make some arguments

13   regarding the 3553(a) factors, starting with the nature and

14   seriousness of the offense, which, we believe a 121-month

12:09PM  15   sentence is necessary to appropriately reflect those

16   offenses.

17         First, as you know, the defendant used a middleman.

18   David Kunkle, who had a reputation of good character and

19   business judgment, and he used that to obtain funds from

12:09PM  20   victims and delay detection of the fraud.

21         As we've heard today, he also pretended to have

22   friends at Goldman Sachs who gave him special access to the

23   pre-IPO shares of Alibaba and impersonated that friend via

24   e-mails to pressure victims into loaning money urgently.

12:09PM  25         Additionally, there were elaborate lies and partial

payments to lull the victims into inaction, and in at least

one instance that was a sham.  I'm referring to count 9 in

the first superseding indictment, which was mailing of an

insufficient funds checks to one of the victims in the case.

12:10PM   He also was able to carry out the scheme for two years

despite the short-term nature of the loans.

Additionally, the lulling cannabis scheme that

began in 2017 took Mr. Odlyzko's life savings and caused

other harms, including emotional and familial strain to the

12:10PM   point where his family had to assume power-of-attorney over

his finances in June of 2020.

Additionally, in carrying out the cannabis scheme,

defendant used his housekeeper to receive and spend funds

from Mr. Odlyzko.  Additionally he actually opened a

12:10PM   financial account in the name of that housekeeper without her

knowledge.

Finally, Kunkle, as we've heard from the victims

today, also lost everything to the Alibaba scheme.  There's

also a victim impact statement from Mr. Kunkle's family.

12:11PM   As Mr. Odlyzko stated today, there may be

restitution or not, but the impacts of this offense are

irreversible.

Now I'll turn to history and characteristics.  In

their sentencing memo defense points to a lack of criminal

12:11PM   history as a mitigating factor.  It is not.  This is simply

the first time that Mr. Rosenthal has been charged.  First,

the investigation of these offenses began due to another

case, United States versus Sarshar, case number

16 CR-527-PSG.  Mr. Sarshar was unable to pay restitution at

his sentencing because defendant had squandered nearly

$16 million out of his trading account.

Next up is a person who we have identified by their

initials AK who loaned defendant more than $100,000 for a

purported cannabis business in Las Vegas.  The evidence shows

that defendant, like the cannabis scheme promoted to

Mr. Odlyzko, was never opened, and Mr. AK was never repaid.

Additionally, and unsurprisingly, defendant did not

report the fraud proceeds from the Alibaba scheme or his many

other schemes on his tax returns, which is why IRS criminal

investigation was the leading investigative agency on this

case.

Defendant also has a history of abusing the

judicial system to avoid accountability.  Defendant evaded

that accountability to victims even when they sought their

day in court.

Beginning with Rodger May, as he and Michael

Zoretic explained today, they attempted several times to get

the truth via deposition and other means, and defendant

refused to participate, going as far as checking into an

urgent care clinic the night before a Court-ordered

deposition so he didn't have to appear.

Ultimately, that case, Copper Leaf versus Rosenthal, resulted in a default judgment due to his refusal to comply with Court orders.  All of the evidence related to the Copper Leaf lawsuit are in Exhibits 13, 14, and 15 of the government's sentencing memo.

Defendant also filed for bankruptcy after several of the victims had obtained civil judgments against him in July 2020.  The defendant and his spouse sat for deposition in the proceedings but refused to answer most questions and instead asserted the Fifth Amendment.

The Bankruptcy Court ultimately dismissed the petition because defendant failed to submit the required documentation.  Evidence related to that matter is contained in Exhibits 16 and 17 of the government's sentencing memo.

Finally, Mr. Odlyzko brought our attention to his lawsuit filed in 2021, which similarly resulted in a default judgment.  He also included as an attachment to his victim impact statement which is in Exhibit 6 the complaint filed in that case.

Even while awaiting trial in this case, defendant continued to deceive and defraud individuals.  First, he rented a New York City apartment in the Upper East Side for $26,500 per month, but he didn't pay a dime.  As of July 2023, defendant owes that landlord $170,357, and the

1    owner is at risk of default on the mortgage and foreclosure.

2    Details are contained in Exhibit 18 to the government's

3    sentencing memo.

4          As we've heard, this is not the first time

5    defendant has rented a luxurious residence and left others

6    with a bill.  Despite taking millions from the victims of the

7    Alibaba scheme, defendant failed to pay rent for a Malibu

8    home that was costing $16,000 per month and later a Beverly

9    Hills residence that cost $25,000 per month.

10         As today Mr. Odlyzko stated, he wired funds for

11    what he thought was the rent of a cannabis dispensary

12    facility, but it turned out that those funds were to pay for

13    Mr. Rosenthal's personal residence, the Beverly Hills

14    residence.

15         Additionally, in his last-ditch effort to continue

16    this trial, defendant misled an acquaintance about the reason

17    why he needed the funds.  Instead of saying it was for a

18    criminal federal case, he said it was for a tax issue.

19         Finally, defense cites in its sentencing memo that

20    family should be considered a mitigating factor.  Defendant

21    has shown a reckless disregard for his family's safety.

22         This is the part I've sanitized, but I'll speak

23    slowly if there's any disagreement.

24         THE COURT:  What I will suggest is that we not get

25    into the specifics of information that was attempted or was

1    provided, shared with law enforcement.

2              MS. HENDERSON:  Yes.

3              THE COURT:  Thank you.

4              MS. HENDERSON:  Defendant has shown reckless

12:16PM  5    disregard for his family's safety, particularly in deputizing

6    a minor family member to contact various law enforcement

7    agencies to report alleged criminal conduct, even in one

8    instance causing the minor family member to pose as his

9    attorney to an FBI agent.  More details are contained in the

12:17PM  10   sealed filing which is docket number 160.

11             Perhaps beside the point, no one in any law

12   enforcement agency found any of the information credible.

13   Law enforcement agencies that were contacted include U.S.

14   Border Patrol, Department of Homeland Security, the FBI, ATF,

12:17PM  15   LAPD, and the DEA.

16             In the course of all these attempts, we've notified

17   counsel of record about the dangerousness of these activities

18   and involving a minor family member.  We cautioned against it

19   to no avail.

12:17PM  20             Finally, I'd like to address the need for sentence

21   to reflect the seriousness of the offense, the deterrence,

22   promoting the respect of law, and just punishment.  As far as

23   specific deterrence, I think the victims have said it quite

24   eloquently today.  They have told us about the history of

12:18PM  25   conning people, creating elaborate lies, and the need to be

1    imprisoned to stop him from harming additional victims.  As

2    Mr. Odlyzko said today, who is next?

3            Then as far as general deterrence, economic crimes

4    are especially difficult to discover and resource intensive

12:18PM  5    to investigate, so the need for general deterrence is high.

6    The sentence needs to show to future fraudsters that the

7    costs outweigh the benefits.

8            Moreover, the value of general deterrence is

9    heightened in these types of offenses, economic crimes,

12:18PM  10   because the conduct is calm, rational, and calculated as

11   opposed to crimes of passion and opportunity.

12           Overall defendant obtained more than $5 million for

13   the Alibaba and cannabis schemes and defrauded 11 victims.

14   Accordingly, a sentence on the high end of the guidelines is

12:19PM  15   warranted and appropriate.

16           THE COURT:  All right.

17           I'm going to ask counsel and Mr. Rosenthal to go to

18   the lectern, please.  Obviously, Mr. Crammer, you're welcome

19   to adjust the lectern so that it is comfortable.

12:19PM  20           MR. CRAMMER:  I appreciate that, Your Honor.

21           THE COURT:  One moment, please.

22           All right.  Mr. Crammer, would you like to be heard

23   on behalf of your client?

24           MR. CRAMMER:  I would, Your Honor.

12:19PM  25           Your Honor, the defense maintains its

recommendation for a low-end sentence in this case.  Picking

up what we filed in our sentencing position, looking to the

nature and seriousness of this offense, Mr. Rosenthal is a

nonviolent man, and this offense was completely nonviolent.

12:20PM  It was an economic crime in which the victims as a whole were

able to recoup the lion's share of the losses -- about

two-thirds of the losses in this case.

Furthermore, Mr. Rosenthal, to history and

characteristics, he has no criminal history.  Although the

12:20PM  government has brought up other unindicted behavior or

conduct that has been alleged, that's all hearsay.  It's

never been the case that a grand jury has signed off on

another indictment for Mr. Rosenthal, and a case has never

been proved up beyond a reasonable doubt.

12:20PM  Given that he has a complete lack of criminal

history and interaction with law enforcement before this

case, the likelihood of him recidivating is very low.  The

fact that this will be by far the longest time that he has

spent in custody, even at low end of the range that the Court

12:21PM  has calculated, 97 months, that's more than enough to take

care of specific deterrence and in general deterrence as

well.

Your Honor, we will also note that Mr. Rosenthal

has, of course, pleaded guilty to this offense.  He's

12:21PM  accepted that he's done something wrong, and he has put

1    himself at the mercy of the Court already.

2           THE COURT:  All right, Mr. Crammer.  Thank you.

3           Can you shed any light on what your client did with

4    Mr. Odlyzko's rare coin collection?

12:21PM  5           MR. CRAMMER:  We do not, Your Honor.  We do not

6    know.

7           THE COURT:  All right.

8           Mr. Rosenthal, if you would like to make a

9    statement for me to consider before I impose sentence, you

12:22PM 10    may.  Please understand that you are not required to say

11    anything at all.  Your attorney has spoken on your behalf.

12           I have reviewed the sentencing memoranda, multiples

13    that were filed by your lawyers, and the other materials that

14    I've referenced earlier during the hearing.  However, you do

12:22PM 15    have a right to speak before I impose sentence.

16           THE DEFENDANT:  Okay, Your Honor.  I'll be very

17    brief.  First of all, I'm just very sorry to the Court and

18    considered Paul a friend.  Sorry to see him suffering like he

19    is.

12:22PM 20           I just don't want to take up much more of your

21    time.  So, thank you, sir.

22           THE COURT:  All right.  Thank you.

23           Thank you, counsel and Mr. Rosenthal.

24           I am going to take a second break in the hearing.

12:22PM 25    I'd like to meet with the probation officer before I come out

1    to pronounce the sentence.

2           So let's go ahead and take about another 10- or

3    15-minute break.  Thank you.

4         (Recess taken from 12:22 p.m. until 12:48 p.m.)

12:48PM 5         THE COURT:  All right.  We are back on the record

6    with counsel and the parties.

7           All right.  I'm going to ask the defendant and

8    counsel to please return to the lectern.

9           (Pause in proceedings)

12:48PM 10        THE COURT:  All right.  Thank you, counsel and

11   Mr. Rosenthal, and everyone else who has participated in

12   today's sentencing hearing.  I am now prepared to impose

13   sentence.

14          Does either counsel know of any reason why sentence

12:49PM 15   should not now be imposed?

16          MS. HENDERSON:  No, Your Honor.

17          MR. CRAMMER:  No, Your Honor.

18          THE COURT:  All right.  I'm going to just add some

19   clarity to the prior ruling I made.  As the attorneys know,

12:49PM 20   Section 1B1.3 addresses relevant conduct that a Court may

21   consider for purposes of calculating a base offense level,

22   specific offense characteristics, and other adjustments under

23   the guidelines.

24          That section specifically provides that for

12:49PM 25   purposes of determining specific offense characteristics,

UNITED STATES DISTRICT COURT

1    which are among the various rulings that I made in response

2    to defendant's objections to those adjustments, that the

3    guideline provides that specific offense characteristics

4    shall be determined on the basis of the following, and at 1A

5    it says:  All acts and omissions committed, aided, abetted,

6    counseled, commanded, induced, procured, or willfully caused

7    by the defendant and that occurred during the commission of

8    the offense, in preparation for that offense, or in the

9    course of attempting to avoid detection or responsibility for

10   that offense.

11        So to the extent that, we'll call it, the cannabis

12   scheme has been considered, and I have considered it for

13   purposes of certain of the specific offense characteristics

14   such as victim vulnerability, for example, in the case of

15   Mr. Odlyzko, and financial hardship, I am considering it

16   under this provision of the Sentencing Guidelines because it

17   involved conduct by Mr. Rosenthal that he personally

18   committed in the course of attempting to avoid detection or

19   responsibility for the original offense, the Alibaba fraud.

20        All right.  Pursuant to the Sentencing Reform Act

21   of 1984, it is the judgment of the Court that the defendant,

22   Frank Harold Rosenthal, is hereby committed on counts 1 and 2

23   of the first superseding indictment to the custody of the

24   Bureau of Prisons for a term of 188 months.  This term

25   consists of 188 months on each of counts 1 and 2 of the first

12:50PM (line 5)
12:50PM (line 10)
12:50PM (line 15)
12:51PM (line 20)
12:52PM (line 25)

1    superseding indictment to be served concurrently.

2           Based on the factors in 18 USC Section 3553(a), I

3    believe that a sentence of 188 months' imprisonment and three

4    years supervised release is sufficient but not greater than

12:52PM  5    necessary to comply with the objectives of Section 3553(a).

6           It is ordered that the defendant shall pay to the

7    United States a special assessment of $200 which is due

8    immediately.  Any unpaid balance shall be due during the

9    period of imprisonment at the rate of not less than $25 per

12:52PM 10    quarter and pursuant to the Bureau of Prisons inmate

11    financial responsibility program.

12           It is ordered that defendant shall pay restitution

13    pursuant to Title 18 United States Code Section 3663(a).  The

14    amount of restitution ordered shall be paid to the following

12:53PM 15    victims in the following amounts:

16           BanBro, LLC, $579,000.

17           Paul Odlyzko, $1,632,200.

18           Robert and Kim McCaw, $81,000.

19           John Kunkle, $72,000.

12:53PM 20           Paul and Lois Kunkle, $50,500.

21           Grant Wigderson, $12,000.

22           The victim, Stuart Wigderson, is now deceased.

23    Grant Wigderson is named for restitution purposes as the

24    executor of Stuart Wigderson's estate.

12:54PM 25           Restitution shall be due during the period of

imprisonment at the rate of not less than $25 per quarter and

pursuant to the Bureau of Prisons inmate financial

responsibility program.  If any amount of the restitution

remains unpaid after release from custody, nominal monthly

payments of at least ten percent of defendant's gross monthly

income but not less than $500, whichever is greater, shall be

made during the period of supervised release and shall begin

90 days after the commencement of supervision.

Nominal restitution payments are ordered as I find

that the defendant's economic circumstances do not allow for

either immediate or future payment of the amount ordered.  If

the defendant makes a partial payment, each payee shall

receive approximately proportional payment unless another

priority order or percentage payment is specified in the

judgment.

Pursuant 18 United States Code

Section 3612(f)(3)(A), interest on the restitution ordered is

waived because the defendant does not have the ability to pay

interest.  Payments may be subject to penalties for default

and delinquency pursuant to 18 United States Code

Section 3612(g).  The defendant shall comply with second

amended General Order 20-04.

Pursuant to guideline Section 5E1.2(a), all fines

are waived as I find that Mr. Rosenthal has established that

he is unable to pay and is not likely to become able to pay

1    any fine.

2              Upon release from imprisonment, Mr. Rosenthal shall

3    be placed on supervised release for a term of three years

4    under the following terms and conditions:

12:56PM  5              One, the defendant shall comply with the rules and

6    regulations of the United States Probation and Pretrial

7    Services Office and second amended General Order 20-04,

8    including the conditions of probation and supervised release

9    set forth in Section 3 of second amended General Order 20-04.

12:56PM  10             Two, the defendant shall refrain from any unlawful

11   use of a controlled substance.  The defendant shall submit to

12   one drug test within 15 days of release from custody and at

13   least two periodic drug tests thereafter, not to exceed eight

14   tests per month, as directed by the probation officer.

12:56PM  15             Three, during the period of community supervision,

16   the defendant shall pay the special assessment and

17   restitution in accordance with this judgment's orders

18   pertaining to such payment.

19             Four, when not employed or excused by the probation

12:56PM  20   officer for schooling, training, or other acceptable reasons,

21   the defendant shall perform 20 hours of community service per

22   week as directed by the Probation and Pretrial Services

23   Office.

24             Five, the defendant shall not be employed in any

12:57PM  25   capacity wherein the defendant has custody, control, or

1    management of the defendant's employer's funds.

2              Six, the defendant shall not engage as whole or

3    partial owner, employee, or otherwise in any business

4    involving loan programs, telemarketing activities, investment

12:57PM  5    programs, or any other business involving the solicitation of

6    funds or cold calls to customers without the express approval

7    of the probation officer prior to engaging in such

8    employment.

9              Further, the defendant shall provide the probation

12:57PM 10    officer with access to any and all business records, client

11    lists, and other records pertaining to the operation of any

12    business owned in whole or in part by the defendant as

13    directed by the probation officer.

14             Seven, the defendant shall not be self-employed nor

12:58PM 15    be employed in a position that does not provide regular pay

16    stubs with the appropriate deductions for taxes unless

17    approved by the probation officer.

18             Eight, the defendant shall cooperate in the

19    collection of a DNA sample from the defendant.

12:58PM 20             Nine, the defendant shall apply all moneys received

21    from income tax refunds, lottery winnings, inheritance,

22    judgments, and any other financial gains to the Court-ordered

23    financial obligation.

24             Ten, the defendant shall submit the defendant's

12:58PM 25    person, property, house, residence, vehicle, papers,

computers, cell phones, other electronic communications or

data storage devices or media, e-mail accounts, social media

accounts, cloud storage accounts, or other areas under the

defendant's control to a search conducted by a United States

probation officer or law enforcement officer.  Failure to

submit to a search may be grounds for revocation.

The defendant shall warn any other occupants that

the premises may be subject to searches pursuant to this

condition.  Any search pursuant to this condition will be

conducted at a reasonable time and in a reasonable manner

upon reasonable suspicion that the defendant has violated a

condition of his supervision and that the areas to be

searched contain evidence of this violation.

I find the sentence to be appropriate for the

following reasons:

Mr. Rosenthal, I want you to understand why I have

imposed the sentence I have imposed today.  I have considered

all of the aggravating and mitigating circumstances in this

case.  You stand convicted of multiple wire fraud counts.

The offense conduct is described in detail in the

presentence report, and I also addressed the conduct in

connection with my rulings during this hearing today in

connection with your objections to various adjustments that

the probation officer recommended to the Sentencing

Guidelines.

1          The offense conduct in my view is indisputably

2     serious, amongst the most serious I have seen in my career as

3     a lawyer and a bench officer.  You devised a scheme that was

4     designed to steal millions of dollars from unsuspecting and

01:01PM   5     trusting individuals.  You made it difficult for the crime to

6     be uncovered, thereby extending the life of the fraud and

7     enhancing your ability to continue to raise money for your

8     own selfish pursuits.

9          You exploited Mr. Kunkle, whose losses were not

01:01PM  10     even taken into consideration under the Sentencing Guidelines

11     or for restitution purposes, and whose reputation for honesty

12     and good character and business judgment enabled you to

13     defraud Mr. Kunkle personally and Mr. Kunkle's friends,

14     family, and trusted advisors.

01:01PM  15          As I said earlier, you fabricated a Goldman Sachs

16     investment banker and created a fake e-mail address and

17     corresponding fake e-mails that bolstered your status and

18     credibility vis-a-vis the victims.

19          The victims have spoken eloquently and credibly

01:02PM  20     here in court and through their victim impact statements.  In

21     Mr. Odlyzko's words, you employed a dark, predatory, and

22     sadistic mode of operation, proved to be totally amoral but

23     very cunningly persuasive, inventive in manipulating others'

24     perceptions, and callous in your clever and harmful conduct.

01:02PM  25          You knew he was sinking in debt.  Mr. Odlyzko

writes that nevertheless, you continued to extract money from

him.  The figure that we've heard today and that is in the

materials submitted rose to well more than $1 million.

Mr. May has described you as a serial liar and an

expert con man who constantly takes advantage of trusting,

innocent people without any regard for the harm that you are

causing; that lying and manipulation comes so easily to you;

that your elaborate web of lies went on for many months,

which only shows how dangerous you are; and that you were

very good at conning people out of their money with a large

number of victims in your wake.

Mr. May's attorney, Mr. Zoretic, who was a witness

to Mr. May's loans to you, eventually brought a civil action

on behalf of Mr. May and his company, Copper Leaf, against

you.

During the life of that action, you retained

multiple sets of lawyers.  You refused to produce documents

or appear for your deposition, going so far as to check into

an urgent care facility the night before your Court-ordered

deposition.

The Court in that case eventually entered default

judgment against you.  Mr. Zoretic has spent three years

trying to collect on that judgment.  You moved from

California to Texas to New York during this time, and

according to Mr. Zoretic, everywhere you went, you left

behind a trail of creditors and more victims.  The

$1.3 million judgment in that case, exclusive of interest,

has not been satisfied.

        Mr. Zoretic also witnessed the pressure that you

placed on Mr. Kunkle.  According to him, Mr. Kunkle went from

being a successful, wealthy, well-respected person with many

friends around the country to a broken man.  He gave up much

of his money to you and lost almost everything else -- his

properties, his business interests, and other assets --

trying to pay off debts that you caused him to undertake.

        Mr. Kunkle lived his last years in financial ruin,

Mr. Zoretic writes, and you took almost everything Mr. Kunkle

had worked for his entire life.  These statements made here

in the courtroom and submitted to me through court filings

reflect the enduring nature and scope of the victims'

injuries, which are indeed and unquestionably substantial.

        The guidelines, the Sentencing Guidelines, have

served as the starting point for the sentence I have imposed

today.  I considered imposing a sentence within the guideline

range but ultimately elected to vary because the guideline

range simply does not capture the danger that you pose to

unsuspecting persons, and that is ultimately the reason I

selected the sentence I impose today.

        My sentence is not driven by any particular

guideline provision or adjustment.  It is ultimately based on

my consideration and application of the 3553(a) factors;

namely, the need for the sentence to reflect the seriousness

of the offense, to promote respect for the law, to provide a

just and fair punishment; and importantly, the need to

protect the public from further crimes by you.

Your total offense level and criminal history

category are not adequate measures of the risk that had you

pose to others.  The guideline range, for example, does not

take into account any of the following:

The loss I just mentioned and the harm caused to

Mr. Kunkle.  The government tells me today here and in its

papers that the investigation in this case arose from another

criminal case, another criminal matter in which you had,

quote, fleeced yet another individual, leaving that person

unable to repay restitution owed.  The prosecutor referenced

that case earlier during this hearing;

And that you defrauded at least another

individual -- I believe it to be Arman Karakhanyan --

regarding a purported cannabis business, much like Paul

Odlyzko was defrauded.  Mr. Karakhanyan claims that he

invested between $100,000 and $200,000 with you to enable you

to secure a cannabis license in Las Vegas, and that you did

not repay any of the money and that his actual loss was

approximately $180,000.

In 2018 and 2019 you were able to convince

UNITED STATES DISTRICT COURT

1    Mr. Odlyzko to lend you another $1,244,200 purportedly to

2    fund a cannabis business.  There was no cannabis business.

3    According to the presentence report, you used Mr. Odlyzko's

4    loan to fund your personal lifestyle, including paying

01:08PM    5    $25,000 a month to rent a home in Beverly Hills and to

6    day-trade stocks and options via your brokerage account which

7    you had opened in your housekeeper's name.

8        The government tells me that you rented an

9    apartment in New York for $26,500 a month during the life of

01:09PM    10    this case, that you failed to pay the rent, that you caused

11    the landlord to risk default on the mortgage and potential

12    foreclosure; and that as of July 20 of 2023, this year, just

13    months ago, that you owed that landlord $170,357.

14        Your conduct while on pretrial release and awaiting

01:09PM    15    trial also evidences the danger that you continue to pose to

16    others.  Despite being under indictment on already serious

17    charges and while on pretrial release, you concocted yet

18    another fraudulent scheme to extract more money from another

19    unsuspecting victim and to secure another continuance from

01:10PM    20    this Court.

21        Like the fictional Mr. Graham at Goldman Sachs, you

22    fabricated an uncle who had allegedly sold multiple

23    properties in Florida and was now prepared to use the

24    proceeds to fund your legal defense in this case.

01:10PM    25        In the end, no uncle ever surfaced.  No funds ever

arrived at your prospective lawyer's bank accounts, and no
evidence of any properties being sold in Florida was ever
produced.

What did surface was yet another prospective
victim, this time an individual in New York, Carlos Eladio,
who you attempted to borrow money from not to buy pre-IPO
shares of a company but to fund your defense in this case.

The government at that time confirmed the existence
of Mr. Eladio and the fact that you did not disclose to
Mr. Eladio that you were under indictment for multiple fraud
counts in California and that you faced going to prison.
Instead, you told Mr. Eladio that you had a tax issue in
California and that you would repay the debt within five
years.

In court you told me through your prospective
attorneys that terms had been reached to secure litigation
funding when they clearly had not.  You breached the trust
this Court placed in you when granting you pretrial release
and proved that you were a continuing danger to the
community.

In one of the most recent filings, it's been
brought to my attention by the government that you have been
using your teenage daughter over the past few months to
engage in a campaign to entice multiple law enforcement
agencies with information of criminal activity in the hopes

1    of securing a reduced sentence.

2            At least one agency investigated the information

3    and found it incredible.  Another -- after another agency

4    refused to speak to your daughter because she was clearly a

01:12PM  5    minor, you used an alias from jail to communicate with that

6    same agency.

7            You also apparently hired a lawyer who is not your

8    attorney-of-record in this case and did not inform your

9    attorneys-of-record in this case who are here before me

01:12PM  10   today.  You hired that lawyer to contact local and federal

11   law enforcement agencies again about purported criminal

12   activity.

13           That lawyer was here earlier today.  I saw him

14   sitting in the courtroom -- Mr. Wiggins.

01:13PM  15           The officers interviewed you at MDC and found you

16   not to be credible.

17           So from all I have read and heard today and at

18   prior hearings, Mr. May is correct.  You are an incorrigible

19   serial liar and an expert con man, and the public must be

01:13PM  20   protected from you for as long as I reasonably and

21   practicably can.

22           I have considered your personal history and

23   background to the extent any of it is known because you

24   refused to meet with the probation officer in preparation for

01:13PM  25   sentencing.

1        I have considered your age, the lack of criminal

2    convictions, the fact that you're married with children, and

3    I am very sorry for whatever your family has endured and will

4    continue to endure.  The aggravating factors in this case,

01:14PM  5    however, overwhelmingly outweigh any mitigating factors.

6        So for these reasons I find that the sentence I

7    have imposed is sufficient but not greater than necessary to

8    comply with the objectives of Section 3553(a).  I have varied

9    upward from the guideline range for the reasons I have just

01:14PM 10    stated.

11        I decline to vary downward because a lesser

12    sentence would put the public at risk and result in an

13    awarded sentencing disparity with other defendants with

14    similar records who have been convicted of similarly serious

01:14PM 15    and egregious conduct.

16        The sentence I have imposed reflects the

17    seriousness of the offense and will protect the public from

18    further crimes by you, afford adequate deterrence to criminal

19    conduct by you in the future, and will provide you with

01:15PM 20    needed educational and vocational training, medical care, and

21    other correctional treatment in the most effective manner

22    available to us today.

23        The statement of reasons shall be included in the

24    commitment order and judgment and shall be provided to the

01:15PM 25    United States Probation Office, the United States Sentencing

1    Commission, and to the United States Bureau of Prisons.

2        Is there any request to recommendation regarding

3    housing?

4        MR. CRAMMER:  Yes, Your Honor.  We would request

01:15PM  5    that Mr. Rosenthal be designated to a facility near New York

6    so that he's close to family.

7        I would also like to object to one of the

8    supervised release conditions; that is, the drug testing

9    condition.  This is not a drug case.  It's a fraud case.

01:16PM  10    According to the PSR, while Mr. Rosenthal may have

11    used marijuana recreationally in his early 20's, he has not

12    used drugs in recent years at all.  So we find it to be not

13    fitting in this case.

14        THE COURT:  I thought I read in the materials that

01:16PM  15    were submitted that he was buying significant amounts of

16    marijuana from a cannabis business, which may have led to the

17    cannabis scheme.  I do not know, but I thought that that was

18    the case.

19        He also refused to meet with the probation officer,

01:16PM  20    so we were unable to determine whether he had any substance

21    abuse history or not.

22        Does the government wish to be heard on this

23    condition?

24        MS. HENDERSON:  Your Honor, the government has no

01:16PM  25    position on the supervised release condition or the

1    recommendation for location of Bureau of Prisons.  However, I

2    did want to discuss the restitution order and some questions

3    we have.

4              THE COURT:  All right.  Let's take them one step at

01:17PM    5    a time.

6              With respect to the supervised-release condition

7    concerning drug testing, again I believe there is evidence in

8    the record that Mr. Rosenthal was purchasing, if my memory is

9    right, between $600 and $700 a week in marijuana from a

01:17PM    10   dispensary.

11             That, combined with the fact that he would not

12   share any information about himself with the probation

13   officer, obviously limited the probation officer's ability to

14   inquire concerning any possible substance-abuse history.

01:17PM    15             So I believe that this condition is intertwined

16   with, substantially related to, and justified by the fact

17   that during portions of the criminal conduct in this case,

18   that he was consuming large amounts of marijuana.

19             So I will overrule the objection and keep that

01:18PM    20   condition in place.

21             With respect to housing, Mr. Rosenthal, please

22   understand that the Bureau of Prisons designates where

23   individuals will serve their sentences.  All I can do is

24   recommend.  I cannot order the Bureau of Prisons, but I will

01:18PM    25   recommend that you serve your sentence in the New York area.

1          Anything else from the defense?

2          MR. CRAMMER:  Not from the defense, Your Honor.

3          THE COURT:  What would the government like to be

4   heard on with respect to restitution -- or anything else?

01:18PM  5          MS. HENDERSON:  Your Honor, we observed that the

6   restitution order regarding victim Paul Odlyzko was not the

7   same as recommended in the presentence report.  We have just

8   two questions.  We wanted to confirm whether the basis of

9   that adjustment is the $1.2 million approximately from the

01:19PM 10   cannabis scheme, which is relevant conduct under 1B1.3.

11          THE COURT:  The figure that I arrived at consists

12   of the original $388,000 that I believe is part of the

13   Alibaba scheme, along with $1,244,200 that Mr. Odlyzko

14   supplied to Mr. Rosenthal later.  I guess we'll call it the

01:19PM 15   cannabis scheme.  Okay?  It does not include the coin

16   collection, for example.

17          MS. HENDERSON:  Understood, Your Honor.

18          I would like to present some case law that may make

19   adding the $1.2 million an issue.

01:20PM 20          Under the MVRA, Mandatory Victims Rights Act, the

21   standard is a little different than relevant conduct.  In

22   cases involving a scheme as an element like this one,

23   restitution may be ordered for all persons harmed by the

24   entire scheme.

01:20PM 25          Particularly instructive here is United States

|       |    |
|-------|----|
|       | 1  | versus Zhou.  That cite is 838 F.3d 1007, pin cite 1013 Ninth

2  Circuit 2016.  In that case, while it did allow additional

3  victims that weren't addressed at the plea colloquy, it found

4  that the indictment addressed the same time period as an

01:20PM  5  additional victim.  And so the Court allowed it in.

6          However, our factual basis in the indictment

7  relates only to the time period November 2013 to April 2015.

8  So I just would like to bring that case law to the Court's

9  attention and potentially resolve the issue with the cannabis

01:21PM  10  scheme that didn't start occurring until 2017.

11          THE COURT:  So is it the government's view that I

12  should not order that amount as restitution in this case?

13          MS. HENDERSON:  I think it could be an error.

14          THE COURT:  All right.

01:21PM  15          MS. HENDERSON:  We could brief the issue on

16  restitution and get that submitted so we have more case law

17  before Your Honor to consider and reconvene in 30 days.

18          THE COURT:  Uh-huh.  Is there any reason to believe

19  it's something other than what you just said?

01:22PM  20          MS. HENDERSON:  We really don't want to get it

21  wrong.  Everything I just recited and the case I just

22  mentioned is the reason for the concern.

23          MR. CRAMMER:  The defense would appreciate the

24  opportunity to brief this issue as well, Your Honor, for what

01:22PM  25  that's worth.

1          THE COURT:  All right.  In that case what I will

2     do, then, is I will amend the sentence to not include for now

3     the $1,244,200.  So the amount in restitution payable to

4     Mr. Odlyzko will be $388,000.  And then I will set this for a

01:22PM  5     continuing restitution hearing for purposes of determining

6     whether that other amount should or should not be added.

7          Is that agreeable?

8          MS. HENDERSON:  Yes.  Thank you, Your Honor.

9          THE COURT:  Is that agreeable with the defense?

01:23PM 10          MR. CRAMMER:  Yes, Your Honor.

11          THE COURT:  All right.

12          Anything else from either side?

13          MS. HENDERSON:  Nothing further from the

14     government, Your Honor.

01:23PM 15          MR. CRAMMER:  Not from the defense, Your Honor.

16          THE COURT:  Mr. Rosenthal, you have a right to

17     appeal your conviction and the sentence with few exceptions.

18     A notice of appeal must be filed within 14 days of the

19     judgment being entered in this case.  Do you understand this?

01:23PM 20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  If you're unable to afford a transcript

22     of the record in this case, one will be provided at

23     government expense.  If you're unable to pay the cost of an

24     appeal or filing fee, you may apply for leave to appeal in

01:23PM 25     forma pauperis.

1        If you do not have counsel to act on your behalf

2    and if you request it, the clerk of the court will prepare

3    and file a notice of appeal on your behalf.  Again, you must

4    make the request within 14 days of entry of judgment.  The

01:24PM  5    notice of appeal must designate the judgment or the order

6    that you're appealing from and the fact that you are

7    appealing to the United States Court of Appeals.

8        It should designate the portion of the proceedings

9    not already on file that you deem necessary for the court

01:24PM  10   reporter to include.

11       Does the government move to dismiss the remaining

12   counts in the first superseding indictment?

13       MS. HENDERSON:  Yes, Your Honor.

14       THE COURT:  That motion is granted.

01:24PM  15       Anything else?

16       MR. CRAMMER:  No, Your Honor.

17       MR. ZORETIC:  Your Honor, I have a question.

18       THE COURT:  This is Mr. Zoretic on video?

19       THE WITNESS:  Yes.  I just wanted to confirm.  I

01:24PM  20   didn't hear the Copper Leaf's amounts were included in the

21   restitution.  Can you confirm and provide some explanation on

22   that?

23       THE COURT:  I don't believe there was an amount

24   attributable to Copper Leaf.  Is that because it was secured?

01:25PM  25       MS. HENDERSON:  Yes, Your Honor.

```
 1              THE COURT:  A secured funds?

 2              MS. HENDERSON:  Yes.  So after accounting for the

 3   repayments and collateral obtained, the amount outside of

 4   interest or any returns that were promised was satisfied.  So

 5   under the MVRA, which is different from loss calculation and

 6   different from relevant conduct considerations, it left a

 7   zero dollar amount for Copper Leaf.

 8              THE COURT:  All right.

 9              MR. ZORETIC:  Thank you, Your Honor.

10              THE COURT:  So that's why.

11              MS. HENDERSON:  My co-counsel asks that the

12   hearing, whenever it may be scheduled, occur before

13   Mr. Rosenthal is transferred to potentially a different

14   facility to avoid the conundrum that could happen with trying

15   to make him present here for the next hearing.

16              THE COURT:  Okay.

17              MS. HENDERSON:  Additionally, just to be thorough,

18   we would also dismiss the counts in the original indictment

19   such that counts 1 and 2 are the basis -- from the first

20   superseding indictment.

21              THE COURT:  All right.  So the original indictment

22   is dismissed.

23              MS. HENDERSON:  Thank you.

24              THE COURT:  How much time do the lawyers need to

25   brief this issue?
```

1    MS. HENDERSON:  Two weeks for the government, Your
2    Honor.
3    MR. CRAMMER:  Two weeks should be fine for us, too,
4    Your Honor.
01:26PM  5    THE COURT:  All right.  Well, you all know what the
6    issue is.  It's fairly narrow.  So I will order that you file
7    briefs on this additional potential amount of restitution.
8    That would be November 23rd.  That's Thanksgiving; isn't it?
9    MS. HENDERSON:  Maybe the day before?
01:26PM 10    THE COURT:  How about the day before?  Can you get
11    them done by the day before Thanksgiving, the 22nd?
12    MS. HENDERSON:  Yes, Your Honor.
13    MR. CRAMMER:  Yes, Your Honor.
14    THE COURT:  All right.  We'll ask you to file your
01:27PM 15    briefs by no later than November the 22nd.  And then,
16    depending on how that looks, I will calendar a hearing if we
17    need one.
18    So why don't we set it for now for -- we'll set a
19    follow-up restitution hearing for the 28th of November at
01:28PM 20    9:00 a.m.  Is there any problem with that date for counsel?
21    MR. CRAMMER:  No, Your Honor.
22    MS. HENDERSON:  No issue for the government,
23    Your Honor.
24    THE COURT:  Okay.  So that will be for the purposes
01:28PM 25    of determining whether any additional restitution should be

1    ordered.

2              Anything else?

3              MR. CRAMMER:  Not from the defense, Your Honor.

4              MS. HENDERSON:  Nothing further from the

01:28PM  5    government.

6              THE COURT:  All right.  Thank you, everyone.

7              THE CLERK:  All rise.  This court is adjourned.

8          (Proceedings concluded at 1:28 p.m.)

9                        CERTIFICATE

10   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

11   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

12   THE ABOVE MATTER.

13   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

14   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

15   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

16

17   /s/ Miriam V. Baird            12/04/2023

18   MIRIAM V. BAIRD                     DATE
     OFFICIAL REPORTER
19

20

21

22

23

24

25