1        **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3      **HONORABLE FERNANDO L. AENLLE-ROCHA, U.S. DISTRICT JUDGE**

4

5    **UNITED STATES OF AMERICA,**               )
                                                  )
6                        **Plaintiff,**           )
                                                  )
7        **v.**                                   )   **Case No. CR 21-31 FLA**
                                                  )
8    **FRANK HAROLD ROSENTHAL,**                  )
                                                  )
9                        **Defendant.**           )
     _____)

10

11              **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
                      **RESTITUTION HEARING**
12               **TUESDAY, JANUARY 23, 2024**
                           **9:10 A.M.**
13                **LOS ANGELES, CALIFORNIA**

14

15

16

17

18

19

20

21

22
_____

23      **MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
                FEDERAL OFFICIAL COURT REPORTER
24               350 WEST 1ST STREET, ROOM 4455
                LOS ANGELES, CALIFORNIA  90012
25                       (213) 894-2305

1                        **APPEARANCES OF COUNSEL:**

2

3      **FOR THE PLAINTIFF:**

4          E. MARTIN ESTRADA
           United States Attorney
5          BY:  MARK AVEIS
           BY:  STEVEN M. ARKOW
6               Assistant United States Attorneys
           312 North Spring Street
7          Los Angeles, California  90012

8

9      **FOR THE DEFENDANT:**

10         CUAUHTÉMOC ORTEGA
           Federal Public Defender
11         BY:  JAKE CRAMMER
           BY:  LISA S. LABARRE
12         BY:  HEATHER PICKERELL
                Deputy Federal Public Defenders
13         321 East Second Street
           Los Angeles, California  90012

14

15     **ALSO PRESENT:**

16
           LIZANDRO LOPEZ, IRS Special Agent
17         PAUL ODLYZKO (via Zoom)

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

|   | 1 | TUESDAY, JANUARY 23, 2024; 9:10 A.M. |
|---|---|---|
|   | 2 | LOS ANGELES, CALIFORNIA |
|   | 3 | -oOo- |
|   | 4 | THE COURTROOM DEPUTY:  Calling LA CR 21-00031, |
| 09:10AM | 5 | United States of America versus Frank Harold Rosenthal. |
|   | 6 | Counsel, please make your appearances, beginning |
|   | 7 | with the Government. |
|   | 8 | MR. AVEIS:  Steven Arkow and Mark Aveis for the |
|   | 9 | United States.  And also appearing at government counsel table |
| 09:10AM | 10 | is Special Agent Lizandro Lopez from the Internal Revenue |
|   | 11 | Service criminal investigation. |
|   | 12 | MR. CRAMMER:  Good morning, Your Honor. |
|   | 13 | Jake Crammer, Heather Pickerell, and Lisa LaBarre here on |
|   | 14 | behalf of Mr. Frank Rosenthal who is present and has consented |
| 09:10AM | 15 | to appear over video teleconference. |
|   | 16 | MS. LABARRE:  Good morning, Your Honor. |
|   | 17 | MS. PICKERELL:  Good morning. |
|   | 18 | THE COURT:  All right.  Yes.  Good morning to |
|   | 19 | everyone.  Welcome. |
| 09:10AM | 20 | And was a written consent filed?  I don't think it |
|   | 21 | had been filed as of yesterday, so I just want to get some |
|   | 22 | clarity on that. |
|   | 23 | MR. CRAMMER:  Your Honor -- |
|   | 24 | THE COURT:  Crammer said he consents.  I just want |
| 09:10AM | 25 | to make sure that we're clear as to this -- the nature of the |

1    consent.  I know -- I can see Mr. Rosenthal, I can see him on

2    video.

3            MR. CRAMMER:  Your Honor, a consent was filed as an

4    exhibit in Docket 192.  That was our unopposed ex parte

09:11AM  5    application, consenting to video teleconference.

6            THE COURT:  Okay.  Thank you.

7            MR. AVEIS:  I was just going to refer to that.  It

8    was a declaration of the defendant at pages 8 and 9, if the

9    Court wanted to confirm.  That was the defendant's declaration.

09:11AM 10            THE COURT:  Yes.  I remember that.  I think it's

11    when I had thought he was still in Los Angeles but I think had

12    actually already been transported to the East Coast.

13            All right.  So had been filed earlier in time.

14            All right.  Mr. Rosenthal, can you see and hear us?

09:11AM 15            THE DEFENDANT:  Yes, Your Honor.

16            THE COURT:  Okay.  Great.  Thank you.

17            And let me just confirm with you, then, it's my

18    understanding that this video appearance has been arranged

19    because you didn't want to be transported back to the

09:12AM 20    West Coast from the East Coast.  So it's being done to

21    accommodate you.

22            But I just want to be doubly sure that you are

23    willing to proceed in this manner and not require to be brought

24    back to Los Angeles for purposes of this hearing.

09:12AM 25            THE DEFENDANT:  Yes, Your Honor.

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:12AM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:13AM | 10 |

1       THE COURT:  Okay.  Very well.

2       All right.  Well, we're here for a -- I guess a

3  final restitution hearing in connection with a possible

4  modification to the amount of restitution owed to one victim,

5  Paul Odlyzko, who did submit a letter to the Court and was here

6  for the sentencing hearing.

7       He's not here today; correct?

8       MR. AVEIS:  He's appearing by the video.  He's in --

9  maybe the -- well --

10      MR. ODLYZKO:  I'm here.

11      THE COURT:  Oh, all right.  He is here by video.

12      Okay.  All right.  So Mr. Odlyzko is attending via

13  video -- or Zoom, as we call it nowadays.

14      All right.  So the parties have filed their

15  respective supplemental sentencing positions in connection with

16  this issue.  So let me take argument from each side.  Let me

17  start with the Government.

18      And is there anything more Mr. Odlyzko wants to add

19  other than what he said at the sentencing hearing?

20      MR. AVEIS:  He hasn't advised us -- so he knew this

21  hearing was for this additional issue.  He hasn't advised us

22  that he --

23      THE COURT:  Okay.  Go ahead.  I'll ask him when

24  you're done.

25      MR. AVEIS:  Yeah.

1      So as Your Honor was referring to, the amount that

2  was ordered at the initial sentencing hearing was in the amount

3  of $388,000.  There's an additional amount of approximately

4  1.2 million.  That's based on money that Mr. Odlyzko gave the

09:14AM  5  defendant.

6      And the Court asked for further briefing, and the

7  parties have done that.  And the probation office also has

8  filed a letter to the Court supporting, along with the

9  Government, the additional amount of the 1.2 million.

09:14AM  10     The parties and the probation officer are in

11  agreement that the applicable -- is that when you have a scheme

12  as was charged and the defendant is convicted of, the Court can

13  order restitution for acts of uncharged conduct as long as it

14  is related and not merely tangentially related.  Parties are in

09:15AM  15  agreement on the law.

16     The conduct by which the defendant obtained an

17  additional amount of over $1.2 million from Mr. Odlyzko was

18  related to the initial scheme relating to the Alibaba stock.

19  The conduct is related because the defendant made it related.

09:15AM  20     The defendant solicited from Mr. Odlyzko these

21  additional monies in 2017, '18, and beyond because defendant

22  tied them, the solicitations, to the original scheme that was

23  to loan defendant money to purchase Alibaba stock.

24     I'm going to refer to some things in the record

09:15AM  25  already because this issue of the related conduct has been

briefed and brought before the Court.  It was brought in a

pretrial motion under, essentially, 404(b).  It was also -- it

also came up at the sentencing hearing.

In the Government's motion in limine to introduce

this conduct by which the defendant solicited additional monies

from Mr. Odlyzko for what was going to be a purported cannabis

or marijuana dispensary, the Government pointed out that in

about November 2017 -- and this is the Docket No. CR-71 at

page 5 -- that defendant reported to Mr. Odlyzko that

defendant, quote, "had a current opportunity to put all this

behind us," end quote.

"All this" was defendant referring back to the

Alibaba and the monies that defendant had obtained from

Mr. Odlyzko for that.

Then defendant solicited Mr. Odlyzko for a loan to

fund what defendant was purporting to be a cannabis dispensary

business.  Mr. Odlyzko, in the course of those conversations,

asked, Are you suggesting wrapping the whole thing, both the

2014 -- and just to step back, 2014 referred to the Alibaba

portion of the scheme -- and 2017?  And that, to step back, was

what Mr. Odlyzko and now defendant were referring to as this

cannabis venture.

So this is a conversation between the victim,

Mr. Odlyzko, and the defendant where the defendant's trying to

get more money but tying it back to trying to wrap it up, put

this behind us, and relating it back to the monies that were

given for the Alibaba.  Defendant said -- and this is in the

Government's papers -- quote, "I won't be able to wrap up 2014

till I get," and then he's referring to the cannabis store

09:18AM  open.

Defendant said he had a, quote, "golden

opportunity," end quote, and, quote, "the solution to recover

the losses," end quote, referring to the losses from the

cannabis scheme.

09:18AM  Then beyond that --

THE COURT:  The cannabis scheme or the Alibaba

scheme?

MR. AVEIS:  The Alibaba loan.  The Alibaba loan,

yes.

09:18AM  Other times when the defendant -- it was his

conduct, his words, his solicitation of Mr. Odlyzko that

brought the procurement of the money for the cannabis scheme

into, relating it to the whole scheme, taken as a whole, and

specifically to right the ship on what happened with the

09:18AM  Alibaba.

They -- the facts that were not contested -- this

was in the presentence report, Document 154 at Footnote 1, that

a year later, in November 2018, Mr. Odlyzko, the victim, asked

for repayment, referring to the Alibaba scheme, and the

09:19AM  defendant replied, quote, "I have a current opportunity that

1    I'm working on 24/7 to make it happen and put all this behind

2    us," end quote.  "All this" is wrapping up the Alibaba scheme

3    with the cannabis.

4         This is defendant's conduct, this is defendant

09:19AM   5    lulling Mr. Odlyzko, the victim, to avoid detection and

6    everything unraveling with the Alibaba, to avoid Mr. Odlyzko

7    pursuing this in court or reporting it to the authorities.

8         And this is defendant, as I say, linking the

9    solicitation of money for the purported cannabis scheme to

09:20AM   10   the -- to the Alibaba.

11        I think this was set forth in the Indictment.  And

12   even in the factual basis for the stipulation wherein defendant

13   pled, but part of defendant's scheme involved this notion of

14   lulling victims.  And in this case, what defendant was doing

09:20AM   15   was -- was lulling Mr. Odlyzko into a false sense of security,

16   to refrain from taking, as I said, either legal or other

17   action.

18        Unless the Court has further questions on why this

19   is related, I'm also going to point out that an additional

09:20AM   20   ground, which the Government asked the Court to find, that

21   justifies the award of restitution for Mr. Odlyzko for this

22   additional amount in connection with the cannabis scheme is

23   that it constitutes relevant conduct.  And this ties back to

24   the Government's argument in the motion in limine for 404(b).

09:21AM   25        And the principle of law that allows the Court to

1    order the restitution based on relevant conduct is at

2    defendant's plea, part of the in-court stipulation.  And it was

3    on the record the Court advised that the Court may order

4    restitution to any victim based on relevant conduct.

09:21AM    5    And for the reasons I said, this conduct is part of

6    the scheme, it's -- it's lulling, it's really a continuation.

7    But, in addition, it qualifies under the definition of relevant

8    conduct in the guidelines in that it includes defendant's acts

9    to avoid detection or responsibility.

09:21AM    10    And that was what defendant was precisely doing in

11    this situation when he was trying to solicit and successfully

12    solicited money from Mr. Odlyzko for this additional venture

13    and -- and lull and have, you know, Mr. Odlyzko not -- Odlyzko

14    not pursue it.

09:22AM    15    If I can refer to the victim impact statement of

16    Mr. Odlyzko, which was filed at Docket No. 145-2 on page 3,

17    Mr. Odlyzko said that -- and I'll try to paraphrase -- but in

18    December 2017 -- and that's what I referred to earlier in my

19    presentation -- and this is Mr. Odlyzko's words -- "based on

09:22AM    20    the defendant's firm, oral, and written promises of quick

21    recovery of my initial Alibaba loan, I wired" -- and then he

22    has a certain amount -- "to" -- "to defendant.  This was wired

23    to defendant's supposed business partner and the owner of the

24    dispensary."

09:23AM    25    And I won't get into the fraud of what was going on,

1    but I'm trying to point out that Mr. Odlyzko was a victim for

2    the monies given in the cannabis because, again, the defendant

3    was tying it.

4            Mr. Odlyzko in his victim impact statement said I

09:23AM  5    was -- quote, "I was induced to continue making more loans to

6    him, as he was claiming that, if I did not, his dispensary

7    venture would fail and would destroy the money lent recently as

8    well as any chances of recovering the Alibaba loan," end quote.

9            So there from the victim is the facts supporting

09:24AM  10    that, based on their conversations between the defendant and

11    the victim, the defendant was tying it.  And that this -- yeah,

12    this is clearly relevant conduct, which under the -- under

13    the -- under the restitution law, the Court can order as an

14    additional grounds.

09:24AM  15            This issue came up at the sentencing because when

16    the Court was determining certain enhancements, specifically

17    the enhancement that Mr. Odlyzko was a vulnerable victim, the

18    Court heard argument -- and I believe that the Court was

19    finding that the cannabis scheme was relevant conduct occurring

09:24AM  20    in the course of defendant attempting to avoid detection or

21    responsibility.

22            And based on that finding, that supported the

23    Court's award of the enhancement that Mr. Odlyzko was a

24    vulnerable victim.

09:25AM  25            Unless the Court has further questions, the

|     |     |
| --- | --- |
|     | 1 | Government would submit. |
|     | 2 | THE COURT:  Just briefly.  In terms of the timeline, |
|     | 3 | the Alibaba scheme runs from about -- was it 2013 through 2015? |
|     | 4 | MR. AVEIS:  Yes.  About that. |
| 09:25AM | 5 | THE COURT:  Okay.  And then the cannabis scheme |
|     | 6 | starts up in what?  2017? |
|     | 7 | MR. AVEIS:  Yes.  What I quoted was at the end of |
|     | 8 | 2017, Mr. Rosenthal was -- well, in response to Mr. Odlyzko |
|     | 9 | asking where's my money, demanding repayment, brings up golden |
| 09:25AM | 10 | opportunity.  And -- |
|     | 11 | THE COURT:  And when was that happening? |
|     | 12 | Mr. Odlyzko's e-mail to Mr. Rosenthal was from 2018? |
|     | 13 | MR. AVEIS:  I believe in late 2017, Mr. Odlyzko |
|     | 14 | and -- and defendant are both orally and maybe exchanging |
| 09:26AM | 15 | written communications. |
|     | 16 | What I referred to -- there is specifically, I |
|     | 17 | believe, a -- |
|     | 18 | THE COURT:  The e-mail you quoted; right? |
|     | 19 | MR. AVEIS:  Yeah.  That's -- |
| 09:26AM | 20 | THE COURT:  I think you said November of 2018. |
|     | 21 | Right? |
|     | 22 | MR. AVEIS:  November 20th, 2018. |
|     | 23 | THE COURT:  Right.  So what was -- what was |
|     | 24 | happening between 2015 and 2017?  Like, is there just sort of |
| 09:26AM | 25 | a -- like, what is happening?  Mr. Odlyzko and others have |

given a significant amount of money to Mr. Rosenthal.

Obviously, they're not seeing a return on their money.

           Is Mr. Odlyzko just sort of checking in with

Mr. Rosenthal every now and then about the status of his loan?

Like, kind of -- is there --

           MR. AVEIS:  I don't want to represent.  I don't have

a firm sense of the -- to fill in that timeline.  It does seem

like you can infer from Mr. Odlyzko checking at the end of 2017

that he's still asking for the repayment.  So I -- I think that

they were stringing along.  There were other -- yeah.

           THE COURT:  Right.  So when we say that the Alibaba

scheme was running from 2013 to '15, that's the period of time

in which investors are, like, contributing toward it when

monies are coming in?

           MR. AVEIS:  Yes.

           THE COURT:  And then they're still waiting on

returns post 2015?

           MR. AVEIS:  Yes.

           And this lulling conduct -- I mean, the Indictment

does phrase -- charge that -- not that the scheme ended in 2015

but until at least.  And the Indictment does build in in the

charging document to this concept of lulling.

           And then at the guilty plea, as part of the factual

basis -- and I'm referring to Docket 124 at page 9 of 11,

paragraph J, that -- and I'll quote -- "As a further part of

his fraudulent scheme, defendant engaged in conduct to lull

victims into a false sense of security and refrain from taking

legal action by, including, but not limited to" -- and then it

has specific examples.

It doesn't specifically have the example of the

cannabis, but this was not limited to only certain examples.

This concept of lulling that was part of the scheme would have

also included what happened between the victim, Mr. Odlyzko,

and the defendant in 2017 and 2018.

Yeah, there are specifics but not maybe relevant to

this victim where other victims were seeking payment.  There

was -- if the Court remembers, there was a lawsuit at some

point filed by another victim, the Copperleaf company.

So -- but as it relates to Mr. Odlyzko, I wanted to

stick to those facts.

(Pause in the proceedings.)

THE COURT:  So directing you to page 9 of

Docket 124, when it says that Rosenthal also sent lulling

communications to individual No. 1 and the victims regarding

the status of repayment of the loans, the purchase of Alibaba

shares, and the sale of Alibaba shares and so on, did that

include Mr. Odlyzko?

In other words, is he either individual No. 1 or one

of the victims?

MR. AVEIS:  He is one of the victims.

And I think I could also address the Court's
question about filling in some of the timeline by referring
back to Mr. Odlyzko's victim impact statement, which was filed
at Document 145-2.  And specifically, I'm looking at the
narrative by Mr. Odlyzko that maybe fills in a little more in
general terms of the timeline.  And this is page 3 of 21.

And I'll paraphrase, starting with the first
paragraph in the middle.  Mr. Odlyzko says, from his
perspective, based on information supplied by defendant and
individual No. 1, the Alibaba affair continued from 2014
through 2015 and 2016 without any admission by the defendant or
individual 1 that it had failed.

Here's an important point that Mr. Odlyzko says.
"We had numerous phone conversations and exchanged some e-mails
on the subject.  And in spite of being distressed by the lack
of repayment, I accepted their explanations that there was a
series of unfortunate delays that were soon going to be taken
care of," end quote.

Then the next paragraph, Mr. Odlyzko says in his
victim impact statement, "In mid 2017, defendant told me about
his new initiative that would enable him to repay the old,"
quote, "loan," end quotes, "without waiting for the resolution
of the baba deal," end quotes.  "Defendant just needed a new
loan to keep the new deal going, promising to repay that loan
as well as the baba," which refers to Alibaba, "loan within a

few months."

And then it goes on and eventually ties to the specific solicitation and Mr. Odlyzko wiring money in December.

THE COURT:  Of 2017?

MR. AVEIS:  Yes.

I have a photocopy of that page, if the Court would want me to approach.

THE COURT:  Sure.

(Pause in the proceedings.)

THE COURT:  All right.  Thank you.

Does Mr. Odlyzko wish to be heard?  Is there anything he'd like to say?

MR. ODLYZKO:  Yes.

THE COURT:  All right.  Mr. Odlyzko, I can see you and hear, I think everyone else here can too.

MR. ODLYZKO:  The period of fall of 2014 through 2017 was marked by exchange of communications, text messages, both with Mr. Rosenthal and with David Kunkle, which is, I think, referred to as individual No. 1, which were basically a -- assurances that things are stuck a little bit but will be okay and included some -- some kind of suggestion of converting me from a lender to an investor, okay, which was never, never talked about, about that.

And then in 2017, this -- this -- the cannabis initiative solution -- well, something not yet resolved with

the Alibaba case, this will be an opportunity to repay the loans but a new loan is required.

And 2017 was spent on efforts to facilitate the store to obtain license, et cetera, et cetera, and then was to culminate -- presumably culminated in the opening of the dispensary right after Thanksgiving 2018.  Now, which -- at which point -- and Mr. Rosenthal claimed that he was already ahead by years, et cetera, et cetera.

And this brings us to another -- another element of this fraud which is a -- an attempt to apparently clear up all the financial obligations related to the dispensary.  And this is how -- how he so-called persuaded me, I let -- let it happen -- to hand over to him my numismatic coin collection which was not mentioned.

So in addition to all the money that was -- that was listed in the spreadsheets and so on, there was also this -- this numismatic collection which was supposed to be returned to me in a matter of -- of a month or two.

And so basically in -- in addition to the losses from the Alibaba loan and the loans from the fall of 2017 and the amounts transferred in 2018, we also have this -- this collection which I would like to recover, I hope to recover. It was promised to be returned to me.  And, of course, none of that happened.

So that's -- that's an important element, I think,

1    when we talk about restitution, at least when it comes to -- to

2    tangible assets.

3          THE COURT:  Government, the value of the -- of the

4    coin collection that's not included in the additional amount,

09:41AM  5    that was, I think, calculated by the probation office.

6    Correct?

7          MR. AVEIS:  That's correct.

8          THE COURT:  Okay.  So the 1.2-plus million, those

9    were just wire transfers of funds from Mr. Odlyzko to

09:41AM  10    Mr. Rosenthal?

11          MR. AVEIS:  Yes.  So not maybe directly to

12    Mr. Rosenthal, but Mr. Rosenthal had that housekeeper setup.

13    But yes.

14          THE COURT:  Okay.  And no effort was -- has been

09:41AM  15    made to put a value on the coin collection?

16          MR. AVEIS:  There has been information provided by

17    Mr. Odlyzko.  That was provided to the defense.  Mr. Odlyzko,

18    in one of his interviews, reported the amount to be about a

19    hundred -- about $850,000.

09:42AM  20          THE COURT:  Mr. Odlyzko, can you shed new light on

21    the value of the coin collection?  When you were here last at

22    the sentencing hearing, I remember you said -- and you correct

23    me if I'm wrong -- but I thought you said you spent over

24    $200,000 in acquiring the pieces, but you estimate -- you

09:42AM  25    estimated the value to be higher.

1   MR. ODLYZKO:  The actual amount spent on acquiring

2   all of this -- this goes over a period of many, many years.

3   What -- (unintelligible) thousand dollars.

4        THE COURT:  What was that number?

09:43AM  5        MR. ODLYZKO:  850-.

6        THE COURT:  That's the amount you spent?

7        MR. ODLYZKO:  That's how much I spent.  It is very

8   difficult without -- without competent appraisal to put a value

9   on it.  This is what I would -- I would like just to recover

09:43AM 10   the collection without -- the actual collection, which right

11   now is sort of -- everybody talks about this -- I think there

12   is -- there is a legal term called "replevin" action where

13   you -- where you demand return of the actual goods that were

14   transferred.

09:44AM 15        THE COURT:  I don't believe we've heard anything at

16   any point to date as to where the coin collection is or what

17   became of it after it was transferred to Mr. Rosenthal.

18        Mr. Crammer at the last hearing told me he didn't

19   know where it was.

09:44AM 20        MR. CRAMMER:  That's correct, Your Honor.

21        MR. ODLYZKO:  If I can add to it, Mr. Rosenthal

22   mentioned that he -- he entrusted this collection to someone

23   named Sean -- if I understand the name -- the person is

24   Sean Cohen and that I was able to -- when I called him, I

09:44AM 25   called him, he hung up and never responded, never answered any

```
 1    other calls.

 2              So I do not know what actually happened while

 3    Mr. Rosenthal was assuring me and my -- our -- a friend and my

 4    brother that he was about to return that collection, of course,

 5    coming up with all kinds of excuses why his efforts to

 6    return -- to return that collection were not successful.

 7              So I have no -- I have no means to -- to investigate

 8    that, and this is where we stand.

 9              THE COURT:  Well, is the victim or the Government

10    asking me to include that amount potentially in the restitution

11    order?

12              MR. AVEIS:  May I have a moment, Your Honor?

13                 (Off-the-record discussion between counsel.)

14              MR. AVEIS:  Your Honor, at this point, the

15    Government is not requesting that be included, absent some more

16    information regarding an appraisal of what the value would be

17    or is.

18              THE COURT:  It doesn't sound like an appraisal is

19    possible.  No one -- there's no custody of the coin collection

20    so that it could be submitted for appraisal.  But we have a

21    figure of 850,000 as to what Mr. Odlyzko spent on it.

22              And, Mr. Odlyzko, you're telling me that -- that in

23    my recall, so from the sentencing hearing, is that the coin

24    collection was essentially the last asset you had that you

25    provided to Mr. Rosenthal who was continuing to ask you for
```

09:45AM (line 5)
09:46AM (line 10)
09:47AM (line 15)
09:47AM (line 20)
09:47AM (line 25)

|  | |
| --- | --- |
| 1 | funds for the purpose of recouping your original loan amount |
| 2 | and the additional amounts that had been loaned as part of the |
| 3 | two schemes and that you transferred physical custody of this |
| 4 | coin collection to Mr. Rosenthal after you had transferred the |
| 09:48AM  5 | 1.2-plus million in, you know, money, currency. |
| 6 | MR. ODLYZKO:  That's correct. |
| 7 | THE COURT:  Okay.  Why would the victim not be |
| 8 | entitled to this amount?  I'll give the defense an opportunity |
| 9 | to be heard, but I'm just -- just posing that question to the |
| 09:49AM 10 | Government. |
| 11 | MR. AVEIS:  I -- |
| 12 | THE COURT:  Is it not a loss? |
| 13 | MR. AVEIS:  It does fall -- it was another like-kind |
| 14 | exchange.  And so it's not because it's not a loss, it's the |
| 09:49AM 15 | uncertainty of -- of a more fixed value to -- to know what the |
| 16 | award should be. |
| 17 | I don't -- |
| 18 | THE COURT:  Mr. Odlyzko, how confident are you that |
| 19 | you spent $850,000 in acquiring these coins?  These are rare |
| 09:49AM 20 | coins; right? |
| 21 | MR. ODLYZKO:  I communicated -- yes.  I communicated |
| 22 | the information to the Government.  I had a, actually, |
| 23 | meticulously kept spreadsheet itemizing all the individual |
| 24 | specific coins, listing the information about -- about -- well, |
| 09:50AM 25 | some of them went through certification, so they're -- there's |

information about that, some of them were not.

And I have all the details about the transactions,
about purchases of the individual items.  Maybe some of the
early ones, going back to, I think, around 1978.  So -- so
there is -- there is no question about how much I spent on it.

As far as the -- as far as the value is concerned,
when I made a -- just very simple estimate of the bullion value
of gold, it ended up to well over 150,000 or $200,000 and not
counting silver.  And I sort of -- I collected items of --
generally in very fine grade.  So -- so there is no doubt that
the actual value is much greater than bullion.

Now, however, to get an appraisal, one would have
to -- as Your Honor mentioned, one would have to have custody
of -- of them, which we, of course, don't.  This is what --
what I would request, actually -- well, I don't know how to --
how to -- I -- I would like to regain the -- this collection
without arguing about its -- its value.  And I think -- but
there's always a question of did I overpay?  It depends on the
buyers.  The actual value is determined at auctions.

So that's all I can say about -- about the -- the
looks of it to me from this conversion by Mr. Rosenthal.

MR. AVEIS:  Your Honor, I could supplement a little
more the basis for Mr. Odlyzko's calculation.

In -- in an interview that Mr. Odlyzko had with the
IRS in this investigation, which a copy of the report was

turned over in discovery at U.S. production No. -- specifically

the paragraph I'm going to refer to is -- it's at 48237,

paragraph 80.

Mr. Odlyzko referred to an exhibit which was of the

09:53AM   gold coin collection inventory.  And there was a paid column

which showed the cost for each coin.  And Mr. Odlyzko has

records for the cost of the majority of the coins.

The current total in the amount of 180 -- $857,256

represents the total paid for the coins, not including the

09:54AM   coins that Odlyzko has no records for.

And this exhibit was made part of the interview

report during -- in discovery.

THE COURT:  And these coins go back to what year?

MR. AVEIS:  I would ask --

09:54AM   MR. ODLYZKO:  My -- the first ones that I acquired

were, I think, around -- well, there were a couple that I got

from -- from my aunt.  But, otherwise, let's say I started

acquiring them in 1978.

THE COURT:  Yes.  But the coins themselves are from

09:55AM   what periods of time?

MR. ODLYZKO:  Well, some of them go back to the --

there were a few coins going back, I think, to the 16th

century, but most -- most of it is post revolutionary American

coinage.  So this is mostly from sort of this date -- 1810 to

09:55AM   200- -- to 1920.

1          So basically the gold -- gold coins and also silver

2     are very -- for me, very -- very interesting collection of

3     silver coins because there are lots of really wonderful coins

4     from that period of time.  But that's -- that's an aside.

09:56AM   5          THE COURT:  All right.  So the Government's position

6     with respect to potential restitution for the coin collection

7     is?  Are you --

8               (Off-the-record discussion between counsel.)

9          MR. AVEIS:  Your Honor, the Government does agree

09:57AM  10     that this is a loss.  The question is a reasonable basis for

11     ascertaining.  We have statements and a schedule, an exhibit

12     from Mr. Odlyzko.

13          If I can just add to that, he also in his statement

14     said that the total weight of the gold coins was about

09:57AM  15     70 ounces of gold.  By today's market price of approximately --

16     we can look this up -- about $2,000 an ounce, that's obviously

17     140-something-thousand plus.  And these are not rare -- and I

18     just use what an ounce of gold is, not what a rare coin is.

19          So there is certainly a basis for awarding

09:58AM  20     restitution in a certain amount for the gold coins.

21          THE COURT:  All right.  Sounds like the collection

22     consists of gold and silver coins; right?

23          MR. ODLYZKO:  That's correct.

24          MR. AVEIS:  When I was -- yeah, but the interview,

09:58AM  25     it seemed, I think, referred to the gold coin collection.  And

what I just cited was the price per ounce of gold.

THE COURT:  All right.  Let me turn to the defense.

Let's start with the 1.2-plus million, which was
transferred first and then you can take up the issue of the
potential inclusion of the amounts spent on the coin
collection.

MR. CRAMMER:  Understood, Your Honor.

To start, I'm sure we all remember on June 30th,
2023, Mr. Rosenthal pleaded guilty to the Alibaba scheme.  And
I think the reason that our discussion today is important is --
the question is:  Is Mr. Rosenthal being held accountable for
the conduct he pleaded guilty to?

We'd argue that he is not, that the Government is
trying to shoehorn $1.2 million, triple what Mr. Odlyzko paid
into the Alibaba scheme into its restitution order after a
plea.

I want to break this down into three categories.
First is the question of is the dispensary conduct related to
the Alibaba conduct?

It is related.  But at the most, it's tangentially
related.  We have never argued that they are completely
separate.  Mr. Odlyzko and Mr. Rosenthal had a history of
interactions by the time they spoke, primarily 2018 and 2019,
starting in late 2017.

So, of course, while they were e-mailing about the

dispensary venture that Mr. Odlyzko was extensively involved

in, at times the Alibaba scheme came up.  And perhaps even the

logistics of how the -- how they financially related came up.

But that does not mean that it's closely related to the scheme

10:00AM    that Mr. Rosenthal pleaded guilty to.

Mr. Odlyzko himself in the impact statement that the

Government read earlier today said that the Alibaba scheme

happened around 2014 and 2015.  There was a lapse.  And then

Mr. Rosenthal approached him with a new initiative.  They are

10:01AM    two separate things.  They -- they are not closely related in

the way that the Government is stating today.

They, um -- Mr. Odlyzko also said that he thought

the Alibaba loan was tied up, which, again, that's -- the

reason he thought that is because of conduct that Mr. Rosenthal

10:01AM    has pleaded guilty to, that he admitted was wrong.

He said that the loans in the Alibaba scheme were

tied up because of various financial terms he would throw

around, he would say there was a lockup period, he would say

they needed more money, he would say things like that.

10:01AM    Mr. Rosenthal admitted to that.  That's why Mr. Odlyzko thought

the funds -- he was still waiting on them.

That is separate from the dispensary venture.  If

you remove the dispensary venture, Mr. Odlyzko still may have

thought that because, again, of the conduct that Mr. Rosenthal

10:01AM    pleaded guilty to.  The dispensary venture is just not part of

1    this case.  Clear tip to that is that it was not counted as

2    part of the restitution in the presentence report, and it is

3    not part of the indicted conduct.

4            Mr. Odlyzko, even for his loan in the Alibaba

5    scheme, was not an indicted victim.  And the Government did not

6    indict Mr. Rosenthal for any conduct related to this dispensary

7    venture.

8            Now, secondly, there's a question of whether this is

9    lulling victims.  And, again, this goes directly to the

10   question of what Mr. Rosenthal pleaded guilty to in June.  He

11   did plead guilty to lulling conduct.  And the lulling conduct

12   that's listed is the conduct I've talked about.

13           He made statements about the Alibaba investment.

14   He -- he made them under fake e-mails, again, a conduct he said

15   was wrong and that he's -- he brought himself to court to be

16   held accountable for.

17           But this is not the lulling conduct that he pleaded

18   guilty to.  If -- if -- if you just put yourself in someone's

19   shoes who's not a lawyer, you know, even having that explained

20   to you, pleading to the lulling conduct that's described in the

21   factual basis of his plea, you wouldn't have imagined a

22   business venture you started two-and-a-half years later would

23   be part of that.

24           In terms of a couple specific questions that came up

25   relating to lulling victims, Individual 1 is not Mr. Odlyzko,

1    that's David Kunkle.  That's who the Government has always

2    referred to as Individual 1.

3            And, again, just to clarify, Mr. Odlyzko is -- is

4    not an indicted victim.  So when it says victims, at most he

10:03AM  5    would be a victim under relevant conduct, but he was not a

6    victim of the indictment -- the indicted scheme.

7            This was a new initiative that involved the same

8    people.  That's why this is a difficult issue to parse out.

9    But it is a new initiative.

10:03AM  10           It -- Mr. Odlyzko only gave one loan for the Alibaba

11   scheme.  He gave multiple transactions and was intimately

12   involved with Mr. Rosenthal.

13           Right now, when Mr. Odlyzko spoke, he even mentioned

14   the term that he was converted from a lender to -- and I forget

10:04AM  15   the exact thing -- the exact term he said but something like a

16   co-investor, which is true.  It was a break in their business

17   relationship even.  He played a different function with

18   Mr. Rosenthal than he had played under the Alibaba scheme.

19           Finally, Your Honor, there's a question of whether

10:04AM  20   this is relevant conduct.  That's been briefed and argued

21   extensively in this case.  I am happy to rest on the briefing

22   that's been filed and the argument that was made at

23   Mr. Rosenthal's sentencing hearing, but we'll take any

24   questions Your Honor has.

10:04AM  25           But wrapping up my comments about the 1.2 million,

what I would say is that the Government has a mechanism for --
if they believe that Mr. Rosenthal committed a crime through
the dispensary venture and that Mr. Odlyzko is owed restitution
for it, the proper mechanism for that is to indict
Mr. Rosenthal for the conduct.

They didn't supersede the indictment in this case to
include it, and they haven't brought any new indictment against
Mr. Rosenthal for it.  That would make this restitution issue
much easier to resolve because then they would work up that
whole issue as though they needed to prove it beyond a
reasonable doubt at trial rather than as something that they're
going to shoehorn in through preponderance standard at
sentencing.

There is a mechanism there.  The Government can use
it -- use it if it chooses to.  And then -- and then
Mr. Rosenthal can fight that case and resolve it however he
chooses to.  But -- but that is not something that's part of
this.

In terms of the coin collection, Your Honor, I would
just ask that if Your Honor is seriously considering adding
that to the restitution order, that we be given a chance to
brief it and argue it at another hearing.  There are legal
questions that I have, there are also just a bunch of
evidentiary questions.

We would like to look closer at the inventory that

```
 1    the Government provided us.  We would like to probably retain

 2    an expert to look at it.  We would like to get more information

 3    about how Mr. Odlyzko came to those figures for each coin.  And

 4    we'd like to know exactly what was transferred to

 5    Mr. Rosenthal.

 6              There's a lot of questions we'd like to brief out

 7    before that's added as part of -- as part of the restitution

 8    order.

 9              THE COURT:  What's your -- what's your argument or

10    position in response to the probation office's finding that --

11    that this additional sum -- you know, at a minimum, the hard

12    currency that was wired in connection with the marijuana

13    dispensary scheme that -- that it is part of that falls within

14    the definition of relevant conduct and, thus, can be included?

15              MR. CRAMMER:  Your Honor -- and, again, similar to

16    what I argued at sentencing, at the initial sentencing hearing,

17    I would argue, first, that the -- the Alibaba scheme ended in

18    2015.  This starts, at earliest, late 2017, mostly happens in

19    2018 and 2019.

20              There's a lapse of communication there.

21    Mr. Rosenthal and Mr. Odlyzko, my understanding was, had not

22    really talked at all between that time.  At most, had talked

23    lightly, according to what the Government's saying today.

24              They're separate schemes.  It can't be brought in --

25    it can't be the case that, if someone commits a fraud and
```

10:06AM (line 5)
10:06AM (line 10)
10:06AM (line 15)
10:07AM (line 20)
10:07AM (line 25)

**UNITED STATES DISTRICT COURT**

1    someone is waiting to be repaid -- you know, the whole point of

2    a fraud is they're always waiting to be repaid until a

3    restitution order is issued.  And then the defendant has to pay

4    it.

5            So the scheme is not ongoing by the time this

6    starts.

7            The other point that I would make is it can be

8    relevant conduct if the point of the scheme was to avoid

9    detection and responsibility for that offense.  And for the

10   reasons I just stated, that is not what was going on here.

11           Mr. Rosenthal started a separate venture.  That was

12   his understanding of it.  That is also the language that

13   Mr. Odlyzko has used at times to describe it, said it was a new

14   venture in which he was playing a new role, working with

15   Mr. Rosenthal in a new way.

16           And, again, in terms of evading detection and

17   responsibility, Mr. Rosenthal did try to do that and he

18   admitted it to the Court in his guilty plea.  There were ways

19   he did that related to the Alibaba scheme.  And he has been

20   held accountable for those, creating the fake e-mail, making

21   statements about an ambiguous lockup period, saying that they

22   will be repaid and then just not repaying them on a certain

23   day.  That's the evasive conduct that Mr. Rosenthal has

24   admitted to -- to committing before the Court.

25           This separate venture is not directly related to

the -- to the Alibaba scheme in a way that justifies it coming

under.

THE COURT:  All right.  Thank you.

Government wish to reply?

MR. AVEIS:  If I can just briefly.

It's -- it's related because the defendant, as I

said, made them related on the Court's point about relevant

conduct.  And one of the bases is to avoid detection or

responsibility for the offense.

I referred to earlier from Mr. Odlyzko's victim

impact statement that he was induced to make more money, to

give more money to the defendant because the defendant was

saying if he didn't give -- if Mr. Odlyzko didn't give more

money, then the Alibaba loan would also go by the wayside and

that the defendant was connecting the two of them together by

saying this was an opportunity to put all this behind us.

So in the conversations to solicit the money for the

cannabis, the defendant was tying back to the Alibaba scheme

and that conduct was forestalling Mr. Odlyzko from going

forward with what eventually he did, a lawsuit.  So it was

defendant's conduct to avoid detection or responsibility for

Alibaba by soliciting additional money for the -- for the

cannabis scheme.

Mr. Odlyzko is certainly a victim of the scheme.

That's why at the initial sentencing hearing, the Court

preliminarily awarded the $388,000.  There's no requirement

that Mr. Odlyzko has to be a named victim in any particular

count to be a victim of this scheme.

Nothing further.

MR. CRAMMER:  Your Honor, may I speak briefly?

THE COURT:  Go ahead, Mr. Crammer.

MR. CRAMMER:  The only point I would make is that if

the Government is saying that the moment that Mr. Rosenthal

used a dispensary venture to cover up or evade detection was

when he said if you don't give me more money, then the Alibaba

loan will never be paid back or something to that effect, then

that -- that makes me think that there was a point when the

dispensary venture was not about -- was not about that.  It was

a separate venture.  Maybe the Government could say that

anything after that arguably was part of it.  Although, we

would dispute that; we'd say it's not.

I think just the timing of that statement reveals

that Mr. Odlyzko and Mr. Rosenthal were -- were dealing with

something completely separate from the Alibaba scheme.

THE COURT:  All right.  Thank you.

All right.  I have considered all of the parties'

arguments in connection with the final restitution amount.

I've read the parties' briefs.  And I thank you for your -- for

the briefing as well as the argument today.

I've also considered the probation office's

assessment of this issue and its recommendation.

As a result, then, it is ordered that the original judgment is amended as follows:

It is ordered that the defendant, Mr. Rosenthal, shall pay restitution in the total amount of $2,426,700 pursuant to 18, U.S.C., Section 3663(a).

The amount as to victim Paul Odlyzko is increased from $388,000 to $1,632,200. I find by a preponderance of the evidence that the additional loss amount of $1,244,200 arises from closely related, uncharged conduct that is part of the charged fraud scheme and that is not tangentially linked to the offense of conviction.

Guideline Section 1B1.3(1)(a) includes as relevant conduct all acts and omissions committed or willfully caused by the defendant that occurred during the commission of the offense of conviction in preparation for that offense or in the course of attempting to avoid detection or responsibility for that offense.

The additional losses that Victim Odlyzko suffered were the direct result of Mr. Rosenthal's efforts to avoid detection and responsibility for the Alibaba scheme, as has been addressed here during the hearing. In November of 2017, Mr. Odlyzko began to make inquiries directly of Mr. Rosenthal and demanding repayment of his original $388,000 loan that he had provided to Mr. Rosenthal and Mr. Kunkle as part of the

1    Alibaba scheme.  And Mr. Rosenthal replied by e-mail that,

2    quote, "I have a current opportunity that I'm working on 24/7

3    to make it happen to put all this behind us."

4            This representation amounted, in my view, to an act

10:15AM  5    of lulling that was intended to help Mr. Rosenthal both

6    perpetuate and avoid detection and responsibility for the

7    Alibaba scheme and induced Mr. Odlyzko to invest additional

8    funds that, as Mr. Odlyzko has stated today in his letter to me

9    in advance of sentencing and during the sentencing hearing,

10:15AM  10    that these additional funds would help him recoup all monies

11    loaned to Mr. Rosenthal, including the original $388,000.

12            As a result of this representation and the events

13    that followed from late 2017 through 2019, in 34 separate

14    transactions, Victim Odlyzko loaned Mr. Rosenthal an additional

10:16AM  15    $1,244,200 so that Mr. Rosenthal could ostensibly secure a

16    retail cannabis license and open a cannabis dispensary in

17    Los Angeles.

18            The dispensary scheme enabled Mr. Rosenthal to

19    conceal that he had used funds from the Alibaba scheme for

10:16AM  20    unauthorized purposes, namely, day trading and personal

21    expenditures, and discouraged Victim Odlyzko from taking legal

22    action or other action against Mr. Rosenthal.  So it delayed

23    Mr. Odlyzko's proactive efforts outside of going to

24    Mr. Rosenthal to get his money back.

10:17AM  25            So because Mr. Odlyzko, the victim, was brought into

the new marijuana dispensary scheme by Mr. Rosenthal and as a result of Mr. Rosenthal's response to Victim Odlyzko's inquiry about his losses or the nonpayment of his loan in the Alibaba scheme, I find that the two schemes were not tangentially linked.  To the contrary, the dispensary scheme, again, in my view, was closely intertwined with the Alibaba scheme to the extent that it helped Mr. Rosenthal re-exploit a prior victim and perpetuate the victimization of Mr. Odlyzko for additional years and, in this manner, secure a significant additional infusion of money.

All right.  So the judgment will be amended.

I'm not going to add the loss amount attributable to the coin collection.  It certainly could have been requested before today.  The parties would have been given an opportunity to consider and to weigh it.

And it seems as if the actual amount is somewhat at issue, it certainly would be a -- I'm not going to find by a preponderance of the evidence that that amount -- that I can safely calculate that amount to include it.  Although, it certainly could fall within the scope of -- of the losses that were incurred in connection with the dispensary scheme that were used -- the scheme that was used to lull Mr. Odlyzko and into not taking other action against Mr. Rosenthal.

All right.  So that's the Court's final order. Thank you very much, everyone.

|      |    |                                                                           |
|------|----|---------------------------------------------------------------------------|
|      | 1  | THE COURTROOM DEPUTY:  All rise.                                          |
|      | 2  | THE COURT:  Anything else?                                                |
|      | 3  | MR. AVEIS:  Well, Your Honor, can I just -- maybe to                      |
|      | 4  | clarify on the ruling, in addition to finding that the                    |
| 10:19AM | 5 | solicitation of the additional money was closely related, to            |
|      | 6  | the extent it is a separate maybe ground, can the Government              |
|      | 7  | ask the Court to find that it's also relevant conduct, which             |
|      | 8  | can be awarded as restitution because at the plea hearing,               |
|      | 9  | defendant understood that the Court can order restitution to             |
| 10:19AM | 10 | the victim for relevant conduct?                                        |
|      | 11 | I can --                                                                 |
|      | 12 | THE COURT:  Well, I don't have an immediate                             |
|      | 13 | recollection of what was said at the plea hearing.  But based           |
|      | 14 | on the case law that the parties submitted and my review of the         |
| 10:20AM | 15 | relevant conduct provision of the Sentencing Guideline, I             |
|      | 16 | believe that the restitution amount -- the additional                   |
|      | 17 | restitution amount that I've ordered can be properly included           |
|      | 18 | as part of restitution.                                                 |
|      | 19 | So Mr. Rosenthal didn't sign a plea agreement.                          |
| 10:20AM | 20 | He -- is my recollection.  Right?  He didn't -- I mean, he            |
|      | 21 | admitted to the facts, I imagine, I'm sure during the plea              |
|      | 22 | hearing.  But do you have a transcript of this hearing?                  |
|      | 23 | MR. AVEIS:  I -- I do, Your Honor.                                       |
|      | 24 | THE COURT:  Okay.  What are you referring to                            |
| 10:21AM | 25 | specifically?                                                          |

1     MR. AVEIS:  I'm referring to the reporter's

2 transcript of proceedings of June 30th, 2023, at page 13,

3 starting at line 10, "Defendant" -- quote, "Defendant

4 understands that defendant will be required to pay full

10:21AM 5 restitution to the victims of the offense to which defendant is

6 pleading guilty and agrees to make such restitution."

7     Next paragraph, "Defendant agrees that the Court may

8 order restitution to persons other than the victims of the

9 offense to which defendant is pleading guilty and in amounts

10:21AM 10 greater than those alleged in the counts to which defendant is

11 pleading guilty."

12     Next paragraph, "In particular, defendant agrees

13 that the Court may order restitution to any victim of the

14 following for any losses suffered by that victim as a result,

10:21AM 15 any relevant conduct as defined in U.S. Sentencing Guidelines,

16 Section 1B1.3, in connection with the offense to which

17 defendant is pleading guilty."

18     And then, in addition, the stipulation regarding the

19 elements, penalties, and factual basis, that's Document No. 124

10:22AM 20 at page 3 of 11 is the same reference, starting at lines 8

21 through 18.  And that was --

22    THE COURT:  And Mr. Rosenthal acknowledged

23 understanding what I was saying to him in connection with the

24 restitution?  I mean, typically I ask questions.

10:22AM 25     MR. AVEIS:  Yes, Your Honor.  At -- at page 15 of

the transcript, at line 11, the Court asked, quote, "Do you understand that I have the authority to order you to pay restitution to the victims of the offenses that you have committed?"

10:22AM        The defendant responded, "Yes, Your Honor."

And that -- that is immediate --

THE COURT:  All right.  Well, it sounds as if the transcript of the hearing and the hearing itself speaks for itself.  So it certainly sounds as if the defendant was warned

10:23AM at the change of plea hearing that he -- I could order him to pay restitution, as you've just stated, and that he understood that that was a potential consequence of changing his plea.

So --

MR. AVEIS:  Yes, Your Honor.

10:23AM THE COURT:  I don't think an argument has been advanced that Mr. Rosenthal did not know that he could be ordered to pay restitution in an amount consistent with what was stated during -- not the precise amount but consistent with what was stated during the change of plea hearing.

10:24AM        Do you wish to be heard on this, Mr. Crammer?

MR. CRAMMER:  I do not, Your Honor.

THE COURT:  All right.

MR. CRAMMER:  Yeah.  And --

THE COURT:  I don't know this is necessary, but it

10:24AM seems to me as if the defendant has acknowledged and

understood, based on the colloquy at the change of plea hearing, that restitution can be ordered consistent with the admonition that I gave to him.  It is essentially what I've done today.  I have included in the restitution amount what the probation office has also concluded constitutes relevant conduct for the reasons I've already stated on the record.

So -- all right, everyone.  Have a good day.  Thank you.

THE COURTROOM DEPUTY:  All rise.  This court is adjourned.

(Proceedings concluded at 10:25 a.m.)

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6              I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17              DATED THIS 23RD DAY OF FEBRUARY, 2024.

18

19

20                       /S/ MYRA L. PONCE

21          _____
            MYRA L. PONCE, CSR NO. 11544, CRR, RDR
22                FEDERAL OFFICIAL COURT REPORTER

23

24

25

**UNITED STATES DISTRICT COURT**